# WILMINGTON AND WELDON RAILROAD COMPANY v. ALSBROOK.

### ERROR TO THE SUPREME COURT OF THE STATE OF NORTH CAROLINA.

No. 1074. Argued November 17, 1892. — Decided December 5, 1892.

The general rule that a valid grant to a corporation, by a statute of a State, of the right of exemption from state taxation, given without reservation of the right of appeal, is a contract between the State and the corporation, protected by the Constitution of the United States against state legislative impairment, is not qualified by *Henderson Bridge Co.* v. *Henderson City*, 141 U. S. 679; nor by *St. Paul, Minneapolis &c. Railway* v. *Todd County*, 142 U. S. 282.

The surrender of the power of taxation by a State cannot be left to inference or conceded in the presence of doubt, and when the language used admits of reasonable contention, the conclusion is inevitable in favor of the reservation of the power.

The exemption from taxation conferred upon the Wilmington & Raleigh Railroad Company by the act of January 3, 1834, incorporating it, was not conferred by that act upon the branch roads which the company was thereby authorized to construct.

Exemption from taxation may or may not be a "privilege" within the sense in which that word is used in a statute; and in the act of North Carolina referred to, the word "privileges" does not include such exemption.

The portion of the Wilmington and Weldon Railroad which lies between Halifax and Weldon, having been constructed by the Halifax & Weldon Railroad Company, and not under the charter of the Wilmington & Raleigh Railroad Company, is not exempt from state taxation.

The proceedings in *Wilmington Railroad* v. *Reid*, 13 Wall. 264, and in the same case in the state courts of North Carolina, do not operate as an estoppel so far as the road from Halifax to Weldon is concerned, nor as controlling authority in the premises.

This was an action brought in the Superior Court of Halifax County, North Carolina, by the Wilmington and Weldon Railroad Company, to restrain the sheriff of that county from collecting certain taxes assessed on so much of a branch road of the plaintiff, known as the Scotland Neck branch, as lay therein, and on that part of the plaintiff's road which formerly constituted the Halifax and Weldon Railroad, and the rolling stock used with said roads. The plaintiff was incorporated under an act of the general assembly of North Carolina, approved January 3, 1834, entitled "An act to incorporate the Wilmington and Raleigh Railroad Company." 2 Rev. Stats. N. Car. (1837), 335, 347. By the first section of this act, commissioners were designated "for the purpose of receiving subscriptions to an amount not exceeding eight hundred thousand dollars, in shares of one hundred dollars each, to constitute a joint capital stock, for the purpose of effecting a communication by a railroad, from some point within the town of Wilmington, or in the immediate neighborhood of the said town, to the city of Raleigh, or in the immediate neighborhood of the said city, the route of which road shall be determined on by the company hereby incorporated." The first twenty sections of the act relate to the main line thus described.

The nineteenth section is as follows:

"That it shall and may be lawful for the said president and directors to determine from time to time what instalments shall be paid on the stock subscribed; to purchase with the funds of the company, and place on the said railroad constructed by them, all machines, wagons, vehicles, carriages and teams of any description whatsoever, which may be deemed necessary and proper for the purposes of transportation; and all the property purchased by the said president and directors, and that which may be given to the company, and the works constructed under the authority of this act, and all profits accruing on the said works, and the said property shall be vested in the respective shareholders of the company, and their successors and assigns forever, in proportion to their respective shares; and the shares shall be deemed personal property, and the property of said company; and the shares

therein shall be exempt from any public charge or tax whatsoever."

The twenty-first, twenty-second, twenty-third, and twenty-fifth sections read thus:

" SEC. 21. That the stockholders in general meeting, may, if they think fit, resolve to construct a branch or branches to the main road, to be connected with the main road at such point or points as they may determine on, and to lead in such direction, and to such a point or points as they may think best; and in order that they may do so, the said stockholders are fully authorized to cause books to be opened for subscriptions to the said lateral road or branch of the main road, and the subscribers for stock shall be subject to all the rules previously made by the company, and become members of the company with this exception only, viz.: that the stock subscribed by them shall be faithfully and honestly applied to the construction of that branch of the road for which they subscribed it; but the subscribers for the main road and the branches shall constitute but one company; and their rights of property and estate shall be in common, and not separate: *Provided, however,* That the whole capital of subscribed stock shall not exceed one million of dollars.

" SEC. 22. That all the powers, rights and privileges conferred by the preceding sections upon the said company, in respect to the main road, and the lands through which it may pass, are hereby declared to extend in every respect to the said company, and the president and directors thereof, in the laying out, in the construction, and in the use and preservation of said lateral or branch roads.

" SEC. 23. That it shall and may be lawful for the said company to construct a branch to the main road as aforesaid, under the restrictions aforesaid, so soon as the main road has reached the point at which the branch road is intended to be joined with the main road; but they shall not, under any pretence whatever, apply the funds of the company to the construction of a lateral or branch road, until the main road is completed, except they be subscriptions specifically made for the branch or lateral road."

"SEC. 25. That where a branch or lateral road to the main road is shorter than twenty miles, no other person or company shall be authorized and empowered to build a railroad from any point near its termination, so as to intersect with this main road in order to injure this company."

Section 24 refers to the right to connect or intersect with "said railroad or any of its branches," and these five sections, out of thirty-eight in all, relate to branch roads.

On December 15, 1835, an act of the general assembly was approved, entitled "An act to amend an act passed in the year one thousand eight hundred and thirty-three, entitled 'An act to incorporate the Wilmington and Raleigh Railroad Company.'" 2 Rev. Stats. N. Car., (1837,) p. 347. This act authorized the capital stock of the company to be increased to any sum not exceeding $1,500,000, and provided "that the stockholders of said company shall and may be at liberty to run the main road from some point within or near the town of Wilmington to some point in the city of Raleigh, or in the immediate neighborhood thereof, or from Wilmington, or near it as aforesaid to some point at or near the river Roanoke in this State, at the election of said stockholders, with the view of connecting with the Petersburg and Norfolk railroads;" "that the said company may be at liberty to lay off and construct any lateral road, under the rules and regulations, provided in the aforesaid act, before or after they have completed the main railroad aforesaid;" "that it shall and may be lawful for the said company to purchase, own and possess steamboats, and other vessels to ply and sail from the port of Wilmington to Charleston, or elsewhere; and to take and receive for the use of said company, over and besides the profits allowed in the said original act, such sums of money or other property for freight, passengers or other accommodation on said boats and vessels, as they may be able to make by contracts with their customers, and according to such rates as they may from time to time establish;" and enlarged the time for commencing the road to three years from January 1, 1836.

At the session of 1833 of the general assembly an act was

passed, entitled " An act to incorporate the Halifax and Weldon Railroad Company." 2 Rev. Stats. N. Car., (1837,) 325, 334. This act contained no exemption from taxation, and was subject to be altered, amended or modified by future legislatures. Under its provisions, the Halifax and Weldon Railroad Company procured its right of way, and laid out and constructed the road-bed and road from Weldon to Halifax, a distance of some eight miles, and entirely in the county of Halifax. The corporation had no rolling stock, but permitted the Portsmouth Railroad Company during the year 1836 to run its cars over its road-bed and track. In 1836 an act was passed, entitled " An act empowering the Halifax and Weldon Railroad Company to subscribe their stock to the Wilmington and Raleigh Railroad Company." 2 Rev. Stats. N. Car., (1837,) 334, 335. Pursuant to the provisions of this act the Halifax and Weldon Railroad Company and the Wilmington and Raleigh Railroad Company entered into an agreement, February 14, 1837, which agreement was in all respects executed and carried into effect by those corporations. The act authorized the stockholders of the Halifax Company to subscribe its stock on the books of the Wilmington Company, and sections two and three were as follows :

" SEC. 2. Upon the subscription of the stock held by the stockholders in the Halifax and Weldon Railroad Company, in the books of the Wilmington and Raleigh Railroad Company, all the property, real and personal, owned and held by the Halifax and Weldon Railroad Company, shall vest in and be owned and possessed by the Wilmington and Raleigh Railroad Company aforesaid, and be owned and held and possessed by the said company in the same manner that all the other property, real and personal, which has been acquired by the said company is owned, held and possessed ; and the road which may have been built, or partly built, by the Halifax and Weldon Railroad Company, shall thenceforward be deemed to all intents, as well criminal as civil, a part of the Wilmington and Raleigh Road.

" SEC. 3. So soon as the subscription hereby authorized shall have been made, all the rights and privileges acquired

under the before recited act of assembly, passed in the year one thousand eight hundred and thirty-three, entitled ' An act to incorporate the Halifax and Weldon Railroad Company,' shall cease and the corporate existence of said company be determined."

The terms of the agreement between the two companies were that the Wilmington Company should receive the assets of the Halifax Company and pay its debts, and the stockholders in the Halifax Company should be entitled to their respective number of shares of stock in the Wilmington Company.

The complaint alleged that " in the year 1840, the plaintiff completed the construction of its main road from the town of Wilmington through the town of Halifax to the town of Weldon on the Roanoke River, in said State, and thereby connected its main line with the Portsmouth and Norfolk Railroad and has had the same in use or operation ever since." The defendant denied the averment as made, and said that the part of the road between Halifax and Weldon was built by the Halifax Company, under its charter, and acquired by the plaintiff in 1837 in pursuance of the act of 1836. The plaintiff in reply averred that the Halifax road was only partially completed, and that the Halifax Company owned no rolling stock or other property of any description except its road-bed and right of way, and referred to the agreement of February, 1837. Plaintiff also, for further reply, set up the proceedings and judgment in an action commenced by plaintiff in 1869 in the Superior Court of Halifax County against the sheriff of that county, to enjoin the sale of property for taxes, partly assessed, as alleged, upon a portion of the road-bed and right of way acquired from the Halifax Company, and pleaded the same as an estoppel. It appeared that the agreement between the two companies above referred to was not registered as required by the act of 1836, but that this was subsequently done under an act approved February 5, 1875. It further appeared that after the execution of the agreement of February 14, 1837, the Halifax Company ceased to exercise any corporate acts or maintain any corporate existence or organi-

zation, and its road-bed, track and right of way passed under the control of the Wilmington Company, and has ever since been under its control as a part of its main line of road. Another act amending the charter was approved January 24, 1851, which authorized the capital stock to be increased to $2,500,000, and the issue of scrip to the extent of the increase. By the third section it was provided: "That said scrip shall represent shares in the capital stock of said company as though the said shares had been originally subscribed for by the holders thereof; and the said holders of the scrip thus issued under the provisions of this act shall be members of the said corporation, with the same privileges, rights, and immunities, and subject to the same rules and regulations as the original stockholders of said company." By an act approved February 15, 1855, the name of the Wilmington and Raleigh Railroad Company was changed to the name of the Wilmington and Weldon Railroad Company. At the session of 1867 of the General Assembly, an act was passed amending the act incorporating the Wilmington Company, which was duly accepted by its stockholders November 13, 1867. This act provided for the opening of books for subscriptions, to any amount deemed necessary, but not to exceed $25,000 per mile, for the construction of any branch to the main line, which stock was to be separate and independent of the stock of the main road, and to be applied exclusively to the branch road for which it was subscribed.

The case came on in the Superior Court before Connor, J., who, from the pleadings, affidavits and exhibits, made and filed findings, in substance as heretofore stated, and further therein found that during the year 1882, the plaintiff began and completed a branch road connecting with its main road at a point near the town of Halifax, in Halifax County, and running to the town of Scotland Neck, in that county, which branch was extended to the town of Greenville, in Pitt County, during 1890, and in 1891 to the town of Kinston, in Lenoir County, being in all a distance of eighty-five miles; that the branch road ran through the county of Halifax for twenty-three and one-half miles; that it was not shown that the said

branch was built pursuant to the provisions of the original charter or amendments thereto; that the branch road was operated and managed by the officers of the plaintiff company, and known as the Scotland Neck branch of the Wilmington and Weldon Railroad; that in addition to the said Scotland Neck branch the plaintiff company owned and operated in the same manner the following other branch roads in the State: The Clinton and Warsaw branch, 13 miles in length; the Nashville or Spring Hope branch, 18 miles in length; the Wilson and Fayetteville branch, 73.6 miles in length; the Tarboro branch, 17 miles in length, making a total of 206.6 miles, the main road being 162 miles in length; that the said branch roads, except the Tarboro branch, had been built within the past ten years; and that the plaintiff company also owned other investments in railroads and other properties.

A transcript of the proceedings and judgment roll, in the case of "*Wilmington and Weldon Railroad Company* v. *John H. Reid*," was attached to the findings.

The railroad commission of North Carolina, pursuant to the provisions of the revenue act of 1891 of that State, (Acts 1891, c. 323,) assessed for taxation the portion of plaintiff's main road and rolling stock from Halifax to Weldon, being the portion acquired from the Halifax Company, and also that part of the Scotland Neck branch in Halifax County, and directed the commissioners of Halifax County to place the same upon the tax list of the county for the year 1891, which was done by the county commissioners, and taxes were levied by them thereon accordingly. The tax list was duly placed in the hands of the defendant, the sheriff of the county, and he demanded payment of the taxes, which, being refused, he threatened to collect the same by distraint.

The Superior Court was of opinion that the tax upon the road-bed and rolling stock between Halifax and Weldon was void, and enjoined the defendant from enforcing its payment; but that the tax levied upon the Scotland Neck branch was valid, and vacated the preliminary restraining order against its collection. Both parties appealed to the Supreme Court, which held that the Superior Court had decided correctly as

to the branch line, but should have also decided the road-bed and rolling stock between Halifax and Weldon to be taxable; and, therefore, in that respect reversed the judgment of that court. Final judgment having been afterward entered in the Superior Court in accordance with the opinion and judgment of the Supreme Court the case was again taken by plaintiff to the Supreme Court and the judgment affirmed, whereupon this writ of error was sued out. The opinions of the Supreme Court, by Clark, J., which discuss the questions involved in all their aspects, will be found reported in 110 N. Car. 137.

*Mr. Samuel Field Phillips,* (with whom was *Mr. Frederic D. McKenney* and *Mr. George Davis* on the brief,) for plaintiff in error.

I. The court below erred in holding that property of the plaintiff appropriate to that part of the main route in question — *i.e.,* from Halifax to Weldon — was not exempt from taxation.

The power of the Wilmington and Raleigh Railroad Company under the amendment of December, 1835, to select Weldon as the "point on the Roanoke" is not only undeniable, but its exercise seems also to have been contemplated by the legislature.

In December, 1835, a company with a capital of $50,000, was constructing a railroad betwixt Halifax and Weldon. It had been charted at the same session as the Wilmington and Raleigh Railroad Company. The amended charter of the latter of that date did not refer, as is to be observed, to any "view of connecting with" the Halifax and Weldon railroad, but only "with the Petersburg and Norfolk railroads," which latter, as has been seen, were then contemplating a common terminus on the Roanoke about Weldon — *i.e.,* about the northern end of the Halifax and Weldon. In other words, the amended charter of the Wilmington and Raleigh Railroad Company suggested that its road for some dozen miles at its northern end might, and probably would run parallel with, and, of course, at a short distance from, that of the Halifax and Weldon. The latter was, on its face, to be a mere neigh-

borhood railroad company, and was regarded as too little a matter of public concern to receive, or probably even to solicit the privilege of exemption from taxation. At all events its property was not so exempt; and after December, 1835, it became confronted imminently, as above, with competition by a railroad company whose road might run immediately by the side of its own, and whose property was to be exempt. About a year afterwards an act was passed making it "lawful" for its stockholders to "subscribe their stock upon the books of" the Wilmington and Raleigh Railroad Company "upon such terms as may be stipulated between the stockholders in the Halifax and Weldon Railroad Company and the president and directors of the Wilmington and Raleigh Railroad Company;" whereupon "all the property, real and personal, owned and held by the Halifax and Weldon Railroad Company shall vest in and be owned and possessed by the Wilmington and Raleigh Railroad Company aforesaid, and be owned and held and possessed by the said company in the same manner that all the other property, real and personal, which has been acquired by the said company is owned, held and possessed; and the road which may have been built or partly built by the Halifax and Weldon Railroad Company shall thenceforward be deemed to all intents, as well criminal as civil, a part of the Wilmington and Raleigh Railroad;" and, finally, "so soon as the subscription hereby authorized shall have been made all the rights and privileges acquired under the before-cited act of Assembly passed in the year 1833, entitled 'An act to incorporate the Halifax and Weldon Railroad Company,' shall cease, and the corporate existence of the said company be determined."

Can the circumstance that it was thought to be bad private economy, and also bad public policy, to require citizens to pay twice $50,000 and maintain two parallel roads, where one $50,000 and one road were sufficient, and that thereupon a device was resorted to by which the subscription already made and partially or completely paid for to one company should be transferred to another upon terms to be agreed upon by the parties thereto, and that then the former company should

cease to exist; can this circumstance, we ask, affect the question whether the property so obtained by the second company would participate in a statutory exemption which covered its property in general? If property which it would have acquired by the working out of their subscriptions by stockholders, under the supposition first named above, would have been exempt, why not equally under the latter?

There was to be no consolidation of the respective companies, nor any union of them, but only a succession. It is only by confounding the Halifax and Weldon road with the Halifax and Weldon Company that any survivorship of that company after the new subscription by its stockholders, or any survivorship of its privileges or of its disabilities or transfers of these, can be argued. Its brains were out; and in the meanwhile the Wilmington and Raleigh Company was not affected in respect to its previous identity, nor as regards any unlimited statutory immunity as to the property which it might require for its purposes. As was said by Coke when arguing a celebrated question it is not under the caps of our learned friends successfully to contradict this.

Inasmuch as the interpretation of charters must depend very much upon the special wording of each, we will confine our citation of authorities from amongst the numerous decisions of the court upon this general topic, to such as seem most nearly related to the present case. See *Philadelphia, Wilmington & Baltimore Railroad* v. *Maryland,* 10 How. 376; *Branch* v. *Tomlinson,* 15 Wall. 460, 464; *Charleston* v. *Branch,* 15 Wall. 470; *S. C.* 92 U. S. 677; *Green County* v. *Conness,* 109 U. S. 104; *Southwestern Railroad* v. *Wright,* 116 U. S. 231; *Chicago, Burlington &c. Railroad* v. *Guffie,* 120 U. S. 569, 573. As a result of these cases we find that two different sorts of statutory modification of the existence or the nature of corporations already existing have in connection with exemptions, etc. been recognized by this court: (1) where the privileges, etc., of several have been consolidated into one; — there the resulting corporation is a new one, the existence of which dates only from such consolidation; and (2), where the privileges of one or more already existing have

been merged into the hands of another already existing, — and there the existence of the latter is held to continue as before, its nature, however, being modified and its added property being received *cum onere* attached to the privileges so merged, in the very way that these had borne such burden previously.

The present is a third and very different case, in which one of two previous companies had been destroyed by legislative action consented to by its stockholders, as completely as if by judicial action under *quo warranto ;* whilst such stockholders had concurrently been authorized to invest their old stock in the other company, which, however, was to receive no additional "privileges," and was left as free to fix by stipulation the value of the stocks so offered for its acceptance as it would have been in regard to any other consideration in kind that might have been offered by any one else in satisfaction of a subscription for its shares.

We therefore submit that the transaction in 1837 with the stockholders of the Halifax and Weldon Railroad Company was in substance a mere subscription by these persons of means of their own to forward purposes of the plaintiff that were already within the provisions of its charter — a transaction in no respect essentially different from ordinary subscriptions to the same purposes when the subsequent work, or the fruits of previous work, or other values are received by a company in satisfaction therefor; and consequently that such assignment is well founded.

II. The court below erred in holding that the property of the plaintiff appropriate to its Scotland Neck branch was not exempt from taxation.

The first provision for branches of the complainant's road occurs in section 21 of the charter of 1834, and this is continued in sections 22, 23 and 25. The only other provision about branches is that contained in the amendment of December, 1835, being the amendment which also authorized a change of the Raleigh terminus to one on the Roanoke River, viz.: Sec. 3. "That the said company may be at liberty to lay off and construct any lateral road, under the rules and regulations, provided in the aforesaid act, before or after they have com-

pleted the main railroad aforesaid, anything in the before-recited act to the contrary notwithstanding."

Under these provisions it has plainly been competent, as is submitted, for the complainant at its own discretion, and at any time, to construct branches from any point whatsoever upon its main road, in any direction whatsoever therefrom, and to any point whatsoever, within the State. The limitations upon the time for beginning and for completing the main road do not apply to the branches. The charter imposed upon those who should accept it a duty to construct the main road. The legislature might, therefore, well limit a period within which that duty should be performed. But as to branches there was no such duty, but only a license. The duty imposed by the charter was to be entered upon and performed at once; but this license was left to be made avail of according as developments might thereafter suggest.

But it is objected on behalf of the defendant that this reasoning disregards the important provisions of section 22, and that these qualify in respect to branches the previous provisions of the charter, so as to limit the "powers, rights and privileges" conferred by these "in respect to the main road and the lands through which it passes" — to matters connected with "the laying out, construction and use, and preservation of said lateral or branch road." From these words it is argued that the provisions of section 19 for exemption do not apply to the branches.

In reply, it is submitted that section 22 is, in both form and substance, a provision to "extend" to the branches only the previous provisions of the charter as to eminent domain for the main road, and that it has no operation upon the previous provision for exemption, which latter, as has been seen, already covered all "the property of said company," part of which property the section immediately preceding this had already *ex industria* pronounced such branches to be, vesting these (even should they be constructed by means of separate subscriptions) in the subscribers to the main road and the branches, as one company in common and not separately.

In the first place, the word "extend" of itself obviously

gives notice that what follows purports to be an enlargement of some previous grant, instead of a restriction thereupon. If section 22 had never been inserted in the charter or were now stricken out, there could. be no doubt, after reading sections 19 and 21, that the property of. the complainant appropriate to its branches is exempt from taxation, whilst, at the same time, it might in such case be seriously doubted whether a right of eminent domain in respect to such branches had been conferred.

The mere words of the first twenty sections of the charter of 1834 appeared not to confer upon the plaintiff a right of eminent domain in respect of its branch roads. Whether, upon the whole matter and general consideration (in the absence of section 22), a court might have so "construed" those sections as to allow to them in this respect an extension of meaning in behalf of branches, it is not necessary to consider and may even be conceded; for no draughtsman of a statute would unnecessarily incur the risks of litigation thereabout, when a few words would take these away. The draughtsmen here were acting in the year 1834, when railroad law (and indeed the American law of eminent domain as well) was in its infancy. They had before their eyes the limitation put upon the previous grant of eminent domain by its words, and could not then be sure as to the effect of a construction based upon general railroad policy, a matter which had then to be foreseen and guessed at. Naturally, therefore, they would exclude all conclusions and by positive terms "extend" to branches a gift already made, and perhaps only in respect to the main road, and we submit that such naturally suggested extension could argue nothing in favor of a restriction upon the provisions of section 19 for an exemption from taxation.

Mr. R. O. Burton (with whom was Mr. Theodore F. Davidson, Attorney General of the State of North Carolina, on the brief) argued for defendant in error. On the question of the jurisdiction of this court he said :

The decision of the state court is based upon a construction of the contract itself. It concedes its validity, but denies that

a certain class of property is within its terms. Hence the writ of error should be dismissed. *St. Paul, Minneapolis &c. Railway* v. *Todd County*, 142 U. S. 282.

If the case in the state court was decided on grounds not involving a Federal question, but broad enough to sustain the decision, this court will refuse to entertain jurisdiction. *Henderson Bridge Co.* v. *Henderson City*, 141 U. S. 679, 688.

*Mr. Thomas N. Hill* (with whom was *Mr. W. H. Day* on the brief), closed for plaintiff in error.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The jurisdiction of this court is questioned upon the ground that the decision of the Supreme Court of North Carolina conceded the validity of the contract of exemption contained in the act of 1834, but denied that particular property was embraced by its terms; and that, therefore, such decision did not involve a Federal question.

In arriving at its conclusions, however, the state court gave effect to the revenue law of 1891, and held that the contract did not confer the right of exemption from its operation. If it did, its obligation was impaired by the subsequent law, and as the inquiry whether it did or not was necessarily directly passed upon, we are of opinion that the writ of error was properly allowed. · *New Orleans Water Works* v. *Louisiana Sugar Co.*, 125 U. S. 18, 38.

We do not regard *Henderson Bridge Co.* v. *Henderson City*, 141 U. S. 679, and *St. Paul, Minneapolis &c. Railway Co.* v. *Todd County*, 142 U. S. 282, cited by defendant in error, as qualifying the rule upon this subject.

In *Henderson Bridge Co.* v. *Henderson City*, it was held by the Court of Appeals of Kentucky that the city of Henderson under a certain city ordinance accepted by the Bridge Company had acquired a contract right to tax that part of the bridge within the city limits in consideration of rights and privileges granted the company by the ordinance, and as this

interpretation justified the municipal taxation in question, and could not be reviewed by us, we declined to maintain jurisdiction.

In *St. Paul, Minneapolis &c. Railway Co.* v. *Todd County*, certain lands were considered by the state court as not within the exemption claimed, under the revenue law existing at its date.

But in the case in hand the court passed upon the action of the authorities in virtue of a legislative act approved more than fifty years after the making of the supposed contract, and explicitly upheld the law.

We are obliged, then, to consider the legality of this taxation in respect of the branch road proper and of the road from Halifax to Weldon.

The inquiry is limited to taxation on corporate property only, though the original exemption also covered the shares of the capital stock in the hands of its shareholders. The legislature recognized the distinction between the one class and the other; and if it were conceded that all the shares should be treated as exempt, as contended, in respect of which we are called upon to express no opinion, yet the entire property of the company might or might not be exempt in the light of all the provisions of the charter with its amendments, and the terms of the authority under which it may have been acquired.

The applicable rule is too well settled to require exposition or the citation of authority. The taxing power is essential to the existence of government, and cannot be held to have been relinquished in any instance unless the deliberate purpose of the State to that effect clearly appears. The surrender of a power so vital cannot be left to inference or conceded in the presence of doubt, and when the language used admits of reasonable contention, the conclusion is inevitable in favor of the reservation of the power.

By its charter the Wilmington and Raleigh Railroad Company, with a capital stock of eight hundred thousand dollars, was empowered to construct, repair and maintain a railroad from Wilmington to Raleigh, and by its nineteenth section it was provided (the punctuation being corrected) that "the

property of said company and the shares therein shall be exempt from any public charge or tax whatsoever."

By section 21 branch roads were authorized, the whole capital of subscribed stock not to exceed one million of dollars, and by section 22 it was provided "that all the powers, rights and privileges conferred by the preceding sections upon the said company, in respect to the main road, and the lands through which it may pass, are hereby declared to extend in every respect to the said company, and the president and directors thereof, in the laying out, in the construction and in the use and preservation of said lateral or branch road."

So far from it plainly appearing from this language that the exemption from taxation was thereby extended to branch roads, it seems to us entirely clear that the words used were words of limitation, and in terms confined the powers, rights and privileges granted to those relating to the laying out, the construction, the repair and the operation of the branches.

The powers, rights and privileges conferred by the preceding sections upon the company in respect to the main road, and the lands through which it might pass, embraced the rights and powers necessary for the laying out, construction, repair, maintenance and operation of a railroad, including the power of eminent domain in the various forms of its exercise; in short, the positive rights or privileges, without which the branch roads could not be constructed or successfully worked, but which did not in themselves include immunity from taxation, a privilege having no relation to the laying out, construction, use or preservation of the road.

In *Railroad Company* v. *Commissioners*, 103 U. S. 1, the Annapolis and Elk Ridge Railroad Company was "invested with all the rights and powers necessary to the construction and repair" of its railroad, and for that purpose was to "have and use all the powers and privileges" and be subject to the obligations contained in certain enumerated sections of the charter of the Baltimore and Ohio Railroad Company. Among these sections was one containing this provision: "And the shares of the capital stock of the said company shall be deemed and considered personal estate, and shall be exempt

from the imposition of any tax or burthen by the States assenting to this law." It was held that exemption from taxation was not one of the privileges of the Baltimore and Ohio Company, which the new company was permitted " to have and use," since the powers and privileges conferred were only such as were necessary to the construction, repair and use of the railroad. And *Railroad Companies* v. *Gaines*, 97 U. S. 697, and *Morgan* v. *Louisiana*, 93 U. S. 217, where similar rulings were made, were cited and approved.

The language of the section under consideration requires the same construction, although the section relates to branch roads of the same company and not to the roads of different companies. The fact that the branches may be component parts of an organic whole; that " the subscribers for the main road and the branches shall constitute but one company, and their rights of property and estate shall be in common, and not separate," (§ 21), does not change the rule, for restrictive words cannot be wrested from their apparent meaning because used in the same charter and with regard to the creation of certain parts of one system, if those subdivisions as authorized have a separate physical existence and constitute in themselves a certain class of property. If other companies had been chartered in the language employed in these sections there could be no question that their property would be liable to taxation, and no reason is perceived for treating these branches as differently situated in this regard.

We cannot accede to the ingenious suggestion of counsel that section 22 was simply a provision for extending to the branches the previous provisions of the charter as to eminent domain only. The powers, rights and privileges were those pertaining to the use as well as the construction of the branches. And if a necessity appeared to exist of specifically conferring upon the company the power of eminent domain in respect of its branch roads, because of the character of the power, it is difficult to see why exemption from taxation should not have been mentioned, for the same reason, if it had been intended to extend that also to the branches. Nor by a play upon the word " extend " can the section be regarded as an enlargement

to the exclusion of restriction. To extend the powers, rights and privileges of the company existing as to the main road so as to comprehend the branches, may, it is true, be said to have enlarged their application, but only in the particulars named, and as restricted by the enumeration.

We do not deny that exemption from taxation may be construed as included in the word "privileges," if there are other provisions removing all doubt of the intention of the legislature in that respect, *Picard* v. *East Tennessee &c. Railroad Co.,* 130 U. S. 637, 642; but we have none such here.

And in this connection, some further observations may properly be made. As pointed out by the Supreme Court, the charter as originally granted was for the construction of a railroad from Wilmington to Raleigh, a distance of something over one hundred miles, with a capital stock of $800,000; and branches were authorized under the sections referred to, interjected into the body of the act, the capital being, however, limited to $1,000,000. The act of 1835 authorized a change of terminus "to some point at or near the river Roanoke," and an increase of the capital stock to $1,500,000, and the company was also empowered to purchase, own and possess steamboats and other vessels to ply from Wilmington to Charleston, or elsewhere. The act of 1851 permitted an increase of the capital stock to $2,500,000. These acts contained no exemption of property from taxation, nor did the act of 1867, which authorized the company to open books for subscription to build branch roads to the amount of $25,000 per mile, nor any other amendatory act availed of by the company.

Under the act of 1835 the road was built to Halifax, one hundred and fifty-four miles, and by the acquisition of the Halifax and Weldon Railroad was extended to Weldon, making a distance of one hundred and sixty-two miles. The findings show over two hundred miles in branch roads. Doubtless these, or some of them, might be treated as constituting parts of the main line in fact, but under the charter that term is applicable to the line from Wilmington to Halifax, or to Weldon, a consideration involved in another aspect of the case.

By section 33 of the act of 1834, the completion of "the

main line from Wilmington to Raleigh within twelve years"
was required, but it is insisted that this limitation had no
application to the branches; that as to the main line its con-
struction was a duty, but as to the branches, their construction
was simply licensed; and that under the acts of 1834 and 1835
it was competent for the company, at discretion and at any
time, to construct branches from any point on its main road
in any direction and to any point within the State. None of
the branch roads were either commenced or finished within
the twelve years. The Tarboro branch, it is said, was built in
1860, and the others, according to the findings, within ten
years prior to December, 1891. We find nothing in the record
to indicate that if the legislature intended to empower this
company to tessellate the State with branch roads, it was
designed that they should be exempted from the payment of
taxes. Whatever effect the acceptance of the amendments
and the delay in building the branches may have had, it is
quite clear that their immunity from taxation cannot be suc-
cessfully asserted under the circumstances.

It remains to examine the case as respects the road from
Halifax to Weldon.

Under the amendment of 1835 the Wilmington Company
was at liberty to run its main road from Wilmington to
Raleigh, or from Wilmington "to some point at or near the
river Roanoke."

The Supreme Court held that Halifax was the point on the
Roanoke River which, by election of the company, was made
the terminus of the main road as authorized, instead of
Raleigh. This followed from the fact that the company only
built its road to Halifax under its charter, and that Weldon
was reached by the acquisition of the road of the Halifax
Company under the act of 1836, passed for that purpose.

The main road of the Wilmington Company was exempt,
but if the Halifax road after its transfer be regarded as a
branch or connecting road, and, at all events, as in law not
a part of the main road, then it was not within the exemption
of the charter, and the taxation complained of was not illegal.
It must be borne in mind that the Halifax road was con-

structed under an act of incorporation which did not withdraw the property of the Halifax Company from taxation. The legislature apparently did not consider it necessary to hold out that inducement to the building of a line between Halifax and Weldon, and when, for the benefit of these railroad companies, it authorized the transaction in question, it must be assumed to have done this as a matter of favor, and not upon the consideration of benefit to the public by the creation of what had already been brought into existence without any special release from common burdens.

The act of 1836 was an act, as its title stated, " empowering the Halifax and Weldon Railroad Company to subscribe their stock to the Wilmington and Raleigh Railroad Company." This was to be done upon such terms as might be stipulated between the two companies, and the terms agreed on were the payment of the Halifax Company's debts, the transfer of its assets, and the issue of certificates to its stockholders of their respective number of shares in the Wilmington Company. Upon that subscription being effected, the act provided that " all the property, real and personal, owned and held " by the Halifax Company should become vested in and be owned and possessed by the Wilmington Company, and be " owned and held and possessed by the said company in the same manner that all the other property, real and personal, which has been acquired by the said company, is owned, held and possessed;" and that the road of the Halifax Company shall " thenceforward be deemed, to all intents, as well criminal as civil, a part of the Wilmington and Raleigh Railroad." The rights and privileges of the Halifax Company thereupon ceased, and its corporate existence was determined. The legal identity of the Wilmington Company remained, while that of the Halifax Company was destroyed; and although the transaction was described by the legislature, in the act of 1875, as a consolidation, it amounted rather to a merger or an amalgamation, and need not be held to have resulted in a new corporation. But it by no means follows that the transfer of the road of the one company to the other made it in law such an extension of the main road of the latter as to bring it within the exemption

from taxation which, as we have seen, was confined to the main road alone. The main road built by the Wilmington Company under its charter terminated at Halifax. The prolongation of the line to Weldon was the result of acquisition under another and different act required to be passed in order to allow this to be done, and not conferring any exemption. As already indicated, if the construction of the main road could be presumed to have been partially induced by the promise of exemption, no such presumption arose from the mere legislative concession of authority to obtain an existing road.

The property acquired was, indeed, to be owned, held and possessed by the Wilmington Company in the same manner as its other property, the real estate as in fee simple and the personality as used and enjoyed, but the way in which property is owned and handled has no necessary relation to an exemption. The branch roads are owned, held and possessed in the same manner as the main road, but the extent of the exemption is limited by the charter. And that limitation was neither explicitly nor by fair implication removed by the language of the act of 1836.

*Central Railroad &c. Co.* v. *Georgia*, 92 U. S. 665, is much in point. There the Central Company and the Macon Company were authorized to unite and consolidate their stocks and all their rights, privileges, immunities, property and franchises, under the name and charter of the Central Company, and thereupon the holders of the shares of the stock of the Macon Company became entitled to receive a like number of shares of stock in the Central Company, upon surrendering their certificates of stock in the Macon Company. It was held that the consolidation did not amount to a surrender of the existing charters of both companies, and the creation of a new company; that the purpose and effect of the consolidation act were to provide for a merger of the Macon Company into the Central Company, and to vest in the latter the rights and immunities of the former, but not to eail ge them; and that as the Macon Company held its franchises and property subject to taxation, the Central Company, succeeding to the ownership, held them alike subject. It was not doubted that

the Macon Company was intended to go out of existence, for, as said by the court through Mr. Justice Strong, provision was made for the surrender of all the shares of its capital stock, and without stockholders it could not exist. The Central Company absorbed the Macon Company, and it ceased to be, just as in the case at bar the merger was to result and did result in the determination of the corporate existence of the Halifax Company.

In *Southwestern Railroad Co.* v. *Wright*, 116 U. S. 231, 236, the question related to the liability of the railroad company for taxes on different parts of its road. The original charter contained an exemption from taxation, and as to two of the parts acquired or built under subsequent legislation, there was a reservation of the right to tax. A third division was constructed under an amendatory act giving authority so to do, "under the rules and restrictions" originally prescribed, but containing nothing about taxation. As the original charter was not the source of power to build the division, it was decided that the exemption therein contained did not extend to the latter. Mr. Chief Justice Waite, delivering the opinion of the court, said: "In building this extension or branch the company was placed 'under the rules and restrictions' they were subjected to in building the original road; but that did not necessarily imply an exemption of this line from taxation to the same extent that the old road was exempted. That exemption was only for that road, and as the amending act does not in terms or by fair implication apply the exemption to the additional road, which was to be built under it, we must presume that nothing of the kind was intended, and that the state was left free to tax that road like other property."

We concur with the state court in the conclusions reached, as sustained by reason and authority.

It appears from the record of the case of *Wilmington and Weldon Railroad Company* v. *John A. Reid*, that certain taxes were imposed in 1869 upon the franchise and rolling stock of the Wilmington Company and upon certain lots of land situated in the county of Halifax, forming part of the property of the company and necessary to be used in the

operation of its business; and that the defendant Reid, sheriff of the county, had seized an engine and tender belonging to the plaintiff in the effort to collect the tax. A demand was made on the county commissioners to correct the tax list in the particular of the levy against the franchise and rolling stock, and subsequently a complaint was filed by the company against the sheriff, the county commissioners not being made parties, setting up that neither the lots nor the franchise or rolling stock were liable to be taxed, because exempt under section 19 of the company's charter. The facts being admitted, judgment was entered sustaining the exemption claimed, and the sheriff was enjoined.

The case was then taken to the Supreme Court of the State, where it was held that the franchise was liable to taxation, and the order of the Superior Court was reversed. 64 N. C. 226. To review this judgment a writ of error was sued out from this court, and it was thereon decided that a statute exempting all the property of a railroad company from taxation exempts not only the rolling stock and real estate owned by it and required by the company for the successful prosecution of its business, but its franchise also, and the judgment of the Supreme Court was in turn reversed. *Wilmington Railroad* v. *Reid*, 13 Wall. 264. These proceedings are relied on as an estoppel so far as the road from Halifax to Weldon is concerned, or as controlling authority in the premises. We think they cannot be so regarded. The causes of action are not identical and the points or questions actually litigated are not the same. The distinction between the road from Halifax to Weldon and the main road from Wilmington to Halifax was not adverted to; and even if that question might have been raised, this suit being upon a different cause of action, the judgment in the former case cannot operate as determining what might have been, but was not brought in issue and passed upon. *Cromwell* v. *County of Sac*, 94 U. S. 351; *Nesbit* v. *Riverside Independent District*, 144 U. S. 610.

It is quite evident that the former action was simply availed of in order to obtain a decision as to the power to tax the main line, and that no other point was controverted.

*Judgment affirmed.*