## COLLIN v. COMMISSIONER OF INTERNAL REVENUE.

Circuit Court of Appeals, Sixth Circuit.
May 10, 1929.

No. 5142.

Hickenlooper, Circuit Judge, dissenting.

Marshall, Melhorn, Marlar & Martin and Thos. O. Marlar, all of Toledo, Ohio (E. J. Marshall, of Toledo, Ohio, on the brief), for petitioner.

John H. McEvers, Sp. Asst. Atty. Gen. (Mabel Walker Willebrandt, Asst. Atty. Gen., and Sewall Key, Millar E. McGilchrist, C. M. Charest, and Shelby S. Faulkner, all of Washington, D. C., on the brief), for respondent.

Before MOORMAN, MACK, and HICKENLOOPER, Circuit Judges.

MOORMAN, Circuit Judge. Petition to review a decision of the Board of Tax Appeals, approving the action of the Commissioner of Internal Revenue in assessing deficiency income taxes against the petitioner for the years 1918 and 1919. The facts found by the board, and upon which it acted, were that in June, 1918, the National Dairy Company of Ohio entered into a contract with Edwards & Ford for the purchase of certain assets of the Ohio Dairy Company, which they had previously acquired from that company. The consideration for this sale was the issuance by the National Dairy Company of 6,500 shares, par value of $100 each, of its preferred stock, and 100,000 shares, par value of $25 each, of its common stock. In September of 1918 petitioner acquired all the rights and interests of Edwards & Ford under their contract with the National Dairy Company. It was necessary to obtain the permission of the Ohio commissioner of securities to the issuance of the stock, and he ordered the return to the National Dairy Company of 30,000 shares of the common stock and directed that any unissued stock of the company which might be issued or sold should be issued or sold in units of one share of preferred stock and two shares of common stock. The petitioner accepted the conditions prescribed by the commissioner, and received under his contract 6,500 shares of the preferred stock and 83,000 shares of common stock. For this he paid $520,312.58. Later, during the calendar year of 1918, he sold 5,205 units of stock, consisting of one share of preferred and two shares of common, for $520,500, and during the calendar year 1919 he sold 295 units of stock in like manner for $29,500. There were no separate sales of the preferred or common stock during the year 1918, but all sales were made in units consisting of one share of preferred and two shares of common, and there were no sales of stock other than the sales made by the petitioner.

In addition to these facts which were stipulated, the petitioner testified, at a hearing before the board, that under his contract with the dairy company he assumed the expense of selling for its account an additional 3,500 shares of its preferred stock; that the common stock held the voting rights; that it had no market value, and no dividends were declared on it in 1918 and 1919; that the only way the preferred stock could be sold was to offer the common with it; and that the only sale that he made of the common during the years in question was a sale of 12 shares in December of 1919 at the price of $20 a share.

It will be noted from the foregoing fact that there was no segregation of values as between the preferred and common stocks in the purchase or sale of the stock units. The board's decision as to what part of the total consideration was paid for the common and what part for the preferred was necessarily, therefore, a matter of inference. It found as a fact that no part of it was paid for the common, and assigned as cost to the preferred the entire consideration given for both.

Under the Revenue Act of 1926 (26 U. S. C. 1226; 26 USCA § 1226) the only decisions of the Board of Tax Appeals that the

courts are permitted to modify or reverse are those "not in accordance with law." It has been held that the review under this statute is limited to matters of law, such as may be raised by writ of error upon review of a judgment entered on a verdict of a jury—that is, to a determination of whether there is evidence to support the findings on which the decision is based, and, if so, whether the findings support the decision as a matter of law. Avery v. Commissioner of Internal Revenue (C. C. A.) 22 F.(2d) 6, 55 A. L. R. 1277; Royal Packing Co. v. Commissioner of Internal Revenue (C. C. A.) 22 F.(2d) 536; Bishoff v. Commissioner of Internal Revenue (C. C. A.) 27 F.(2d) 91. The statute lacks the provision, common to statutes dealing with fact-finding agencies, that the findings of fact shall be conclusive if supported by evidence—indeed, there is no provision requiring the board to make such findings. The absence of such provision from this statute gives some support to the view that the power of review is as in equity. As the facts in this case, however, do not require it, we do not decide whether this review is of that character, or is as at law, but proceed to consider the questions presented from the point of view of the cases cited.

The first contention of the petitioner is that there was no income for the year 1918 because the purchase of the stock was not completed until 1919, when petitioner finished selling the 3,500 units which he was required to sell for the account of the National Dairy Company. We find ample evidence to support the ruling of the board on this point. The stock was acquired and paid for in 1918, and the tax was assessed on the profits from the sale thereof in the same year. With this out of the way, no question is made as to the correctness of the board's decision, if its finding that the common stock had cost the petitioner nothing is correct.

The decision which the board reached upon this issue was based largely, if not wholly, as we judge from its opinion, upon the ground that the common stock "was highly speculative and entirely prospective." We do not deem it necessary to go into a discussion of the facts from which this conclusion was drawn. It is enough to say that such a conclusion did not afford a basis for the finding that the stock cost nothing, since there is generally an existing value even in speculative and prospective values. Furthermore, the other facts which the board found show that the stock had such existing value. There was the question of the future management of the company, as it would affect earnings and dividends. This right of management and control, which was vested in the common stock, was itself valuable, and must have entered into the consideration of the purchaser. The stock, it is true, had no separate market value, but neither had the preferred. It was shown that the petitioner could not have sold the preferred alone, even if it had been permitted to do so by the Ohio commissioner of securities. From these facts it is clear that the finding was not supported by evidence.

We are satisfied that some part of the total price paid for the stock units was paid for the common stock—what part we are unable to determine on the record here. Upon another hearing it may be practicable to obtain data or facts upon which a fair apportionment of cost as between the two classes of stock may be made, but, if it should not be, then, under article 39 of Regulation 45, the petitioner will not be chargeable with any profits until he shall have recovered the entire purchase price.

Reversed and remanded.

HICKENLOOPER, Circuit Judge (dissenting). I cannot concur. Under the provisions of article 39 of Regulations 45, the determinative issue does not seem to me to be so much whether the 70,000 share bonus formed part of the incentive of Collin to make the purchase and therefore part of the consideration received, as an issue of fact, viz. whether the purchase price could "be fairly apportioned between the stock and securities purchased." Obviously this means, with fairness to both the government and the taxpayer, not necessarily a mathematically exact apportionment, and a solution of the question depends upon a multiplicity of evidential facts such as the nature of the securities purchased, market and book values at the time, the purposes for which the securities were purchased, whether the parties themselves dealt with direct reference to a unit price, or a gross price for an unapportionable whole, whether in a practical sense, as well as a highly theoretical sense, the profits are to be considered as properly allocated to any specific year, and like considerations.

Each and all of these evidential aids to a solution of the issue seem to point to the propriety of the apportionment made by the Board of Tax Appeals. The common stock, forming the bonus, had neither book nor market value at the time. Collin bought 6,500 units, each consisting of one share of preferred and two shares of common, with a pure bonus of 70,000 shares of common. The units were bought for resale. The 70,000 shares were acquired to be retained for

purposes of company control and increment in value as yet wholly speculative. He intended two distinct and separate types of profit, one from the *sale* of the units, the other from the *retention* of the bonus. They should be treated separately. The parties themselves seem to have dealt upon a unit price basis of $80 per unit plus some incidental expenses. The 70,000 common share bonus was considered as the promoter's margin, or, in their vernacular, as "velvet." In a practical and very proper sense, the profits ultimately realized upon resale of units in 1918 were profits realized in that year. Whether they should be so considered should be determined, if possible, by considering the situation as of that time, and without regard to changes in rate of tax, variation in net income of the taxpayer for the several years, and the like. The utmost that the taxpayer should be permitted to claim is that the profits be not unreasonably (and therefore unfairly) augmented by arbitrarily fixing the cost price too low. Here, attributing the entire cost to the 6,500 units raised such cost to approximately $80 per unit, to the benefit rather than the prejudice of Collin. If apportionment were fairly possible, the apportionment was as fair to Collin as he could ask.

Furthermore, the determination of the possibility or practicability of fair apportionment seems to call distinctly for the exercise of a sound discretion and judicial power on the part of the board. The claim that apportionment is not fairly possible is in the nature of a claim for exemption, at least for the then current year. To be sustained, this claim must be made out by clear and convincing proofs. Any doubt upon the question is fatal to the claim. Wilmington & Weldon R. Co. v. Alsbrook, 146 U. S. 279, 294, 13 S. Ct. 72 (36 L. Ed. 972); Bank of Commerce v. Tennessee, 161 U. S. 134, 146, 16 S. Ct. 456 (40 L. Ed. 645); Yazoo, etc., R. Co. v. Adams, 180 U. S. 1, 22, 21 S. Ct. 240 (45 L. Ed. 395). Collin has offered no proof of this quality that the apportionment was either impossible or impracticable. He has contented himself with saying it could not be made. At most, it seems to me doubtful that the apportionment made was either unfair, impracticable, or unreasonable. This court should not, in my opinion, interfere in the exercise of discretionary powers of the board nor reverse the findings in this case upon this question of fact—the fact of possible fair apportionment—in the face of substantial evidence that the apportionment was both possible and fair.