## HOUGHTON et al. v. COMMISSIONER OF INTERNAL REVENUE, and six other cases.

### No. 367.

Circuit Court of Appeals, Second Circuit.

June 18, 1934.

Charles Angulo, Russell L. Bradford, and George H. Craven, all of New York City, William Flannery, of Elmira, N. Y., Wm. R. Green, Jr., of New York City, and Norman E. Webster, for petitioners.

Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and John MacC. Hudson, Sp. Assts. to Atty. Gen., for respondent.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This appeal comes up upon seven petitions of taxpayers who challenge the correctness of assessments levied against them for alleged gains arising from the sales of preferred shares of stock in the year 1923. The facts were as follows: For long before March 1, 1913, the petitioners or their testators had owned shares of stock in an old manufacturing company situated in Corning, New York, and known as the Corning Glass Works. On March 1, 1913, the shares had all been "common" with a par of $100, and the "fair market value" was $371.11. In 1920 each of these shares had been exchanged for twenty shares of no par value and in December, 1923, every shareholder received in exchange for these twenty new shares four shares of 7% preferred stock with a par of $100 and sixteen shares of new no par shares. All the petitioners at once sold half their holdings in the new preferred shares. Both exchanges were "reorganizations" within the meaning of section 202 (c) (2) and (d) (1) of the Revenue Act of 1921 (42 Stat. 230), but the sale of the preferred shares was a taxable transaction if their "basis" could be determined. If it could not, then under article 1567 of Regulations 62 (Act of 1921); there was no gain until the whole value of March 1, 1913, had been recovered. This

article so far as material is quoted in the margin.[1] The Commissioner found that the common shares issued in 1923 were then worth $73.43, and the preferred shares $100. From these figures he could, and did, find a "basis" for the preferred shares as of March 1, 1913, by following the regulation, in spite of the fact that there were no preferred shares before 1923. The taxpayers protested that the common shares had no "market value" in December, 1923, but the Board affirmed the ruling. The question on these appeals is whether there was any evidence to sustain the Commissioner as to the "market value" of the common shares issued in 1923.

The taxpayers proved that, with certain exceptions agreed to be irrelevant, no shares in the company had ever been sold; the stock being closely held by members of one family. They also proved that although the will of a deceased owner had directed his trustees to sell his parcel of shares, they had not sold them for twenty-six years, and that their failure had been excused by the decree of a surrogate. They testified that sales were impossible at any reasonable price, though they had done no more than inquire for buyers in a desultory way in the city of Corning, efforts certainly not impressive of any pressing desire. On the other hand the company had had a substantial history, going back more than thirty years; its shares were an industrial investment of a kind similar to many which are listed upon exchanges. Though no effort had ever been made to list them, so far as appears that could have been done; and may have been omitted only because the family wished to keep control of the business. The Commissioner adopted a formula which was not shown to be ill fitted to reach the true "market value" of such property. He found the average income of the company for five years and appraised its tangibles for the same period. He then deducted from the average income eight per cent. of the value of the tangibles. The remainder he capitalized at fifteen per cent.

and took that as the value of the intangibles. The sum of tangibles and intangibles was the value of the assets; the value of the common shares was this sum less the par of the preferred shares.

■■ The question is not so much whether the value fixed was right, as whether the shares had any "market value" at all. We have just held in Helvering v. Walbridge, 70 F.(2d) 683, that "fair market value" by no means always exists, as that phrase is used in article 1570 of Regulations 62 (Act of 1921), and earlier and later forms of the same regulation, and in the precursors of section 111 (c) of the Act of 1928 (26 USCA § 2111). Without trying to define it precisely we said that, although it did not necessarily presuppose a market in the formal sense, one must have assurance that the figure fixed would be that which the higgling of several buyers and sellers would establish. What would be ground for such an assurance we did not try to lay down, beyond our actual decision, which was that an interest in a newly created partnership of four members did not have any market value. In Taylor v. Com'r, 70 F.(2d) 619, we had before us a similar question; that is, whether it was possible to allocate between common and preferred shares the value of certain assets received at an earlier date. We held that the method there adopted by the Commissioner was plainly untenable, and sent the case back for another hearing, being unwilling to hold the taxpayer to disproving every possible value which the shares might have been found to have; and intimating that an appraisal made upon some such theory as the Commissioner here adopted might stand. See, also, Collin v. Com'r, 32 F.(2d) 753 (C. C. A. 6). Neither of these decisions embarrasses us here in affirming the Board. This was not an untried venture as to whose success nobody could predict; it was an old, profitable, thoroughly seasoned business, which had paid large dividends and was as stable as such ventures could well be, though

---

[1] "Art. 1567. *Gain or loss from subsequent sale.*—(a) Where property is exchanged for other property and no gain or loss is recognized * * * the property received shall for the purpose of determining gain or loss from its subsequent sale be treated as taking the place of the property exchanged therefor. * * * If property is exchanged for two kinds of property and * * * if no fair apportionment is practicable, no profit on any subsequent sale of any part of the property received in exchange is realized until out of the proceeds of sale shall have been recovered

the entire cost of the original property. When securities of a single class are exchanged for new securities of different classes so that no gain or loss is realized * * *, for the purpose of determining gain or loss on the subsequent sale of any of the new securities the proportion of the original cost, or other basis, to be allocated to each class of new securities is that proportion which the market value of the particular class bears to the market value of all securities received on the date of the exchange. * * *"

658

of course it was subject to fluctuations inevitable in any industry. It was not a new partnership whose shares are not an accustomed form of investment; the interests of the owners were shares of stock, the commonest form of industrial property. Although these had not indeed been dealt in, so far as appears, there may have been persons, familiar with such securities, when listed upon an exchange, or traded in as unlisted stocks, who would have undertaken to appraise them, and whose estimates would have been a reliable judgment as to their "market value." That is not an uncommon way for example to appraise real property. Although each parcel is unique, a good appraiser will often predict its market price with surprising accuracy. Moreover, the conditions of a market might by proper publicity here have been created; a number of competing buyers, not confined to this investment. We cannot regard the evidence of the taxpayers as foreclosing that possibility; and it was on them to show that an accurate appraisal, a genuine forecast of market value, was impossible. This they might have done directly by calling witnesses, or as in Collin v. Com'r, supra, 32 F.(2d) 753 (C. C. A.), and Taylor v. Com'r, supra, 70 F.(2d) 619, by showing the inherent vice of the Commissioner's method. They have done neither and we can only assume that they could not do so.

It is not easy to find any cases which are close on the facts, but in some, the discussion clearly presupposes that the method we have suggested is permissible. In Heiner v. Crosby, 24 F.(2d) 191 (C. C. A. 3), the court recognized the validity of a finding of "intrinsic value" based upon the opinions of experts, even though there had been sales at very different prices. Although the decision was contrary in O'Meara v. Com'r, 34 F.(2d) 390 (C. C. A. 10), the opinion contains a plain intimation, [page 395 of 34 F.(2d)], that the "market value" may be found by the method we have suggested. See, also, Walls v. Com'r, 60 F.(2d) 347 (C. C. A. 10). We recognize that in fixing "fair market value" on March 1, 1913, courts have been so much under the pressure of necessity that their rulings are not to be taken too broadly, and yet, formally at any rate, the question is the same; evidence has been accepted in that situation with great latitude. Chicago Ry. Equipment Co. v. Blair, 20 F.(2d) 10 (C. C. A. 7); White & Wells v. Com'r, 50 F.(2d) 120 (C. C. A. 2); Walter v. Duffy, 287 F. 41 (C. C. A. 3).

Order affirmed.