BEDFORD-BOWLING GREEN STONE CO. v. OMAN et al.*

(Circuit Court, W. D. Kentucky. June 10. 1904.)

1. JUDGMENTS—RES ADJUDICATA—SCOPE OF DECISION—SUBSEQUENT CHANGE OF CIRCUMSTANCES.

A decision of a state Court of Appeals that certain parties had no property rights in a railroad switch over another's land, but were entitled to car service during the continuance of a certain contract between the railroad and that other, because the switch was operated by the railroad as a common carrier, was res adjudicata in a subsequent suit between the parties or their privies on the question of their property rights in the switch, but did not preclude inquiry into the rights of the parties in the use of the switch, where subsequently to the decision the contract relied on by the decision was abrogated, and the railroad had sold the switch to the owner of the land over which it was laid.

2. RAILROADS—PRIVATE SWITCHES—USE FOR PUBLIC BUSINESS.

Persons who have no property rights in a private switch over another's land cannot compel the latter to permit the railroad to receive and ship their freight over the switch to the railroad's own track.

3. SAME—SALE OF SWITCH—RIGHT OF STRANGER TO COMPLAIN.

A contract by which a railroad operates, in its capacity as common carrier, a switch over private property, may be abrogated at will by the railroad and the owner of the property, and the switch may be sold to the latter, regardless of the motives of the parties to the contract in so doing; and a stranger to the contract, who is interested in the maintenance of the switch by the railroad as a carrier, cannot complain of the contract as fraudulent merely because the purchase price was not paid in cash, but promissory notes were given therefor.

4. SAME—FRAUDULENT TRANSACTIONS—BURDEN OF PROOF.

The burden is on a stranger to a transaction whereby a railroad sold a switch to the owner of the land over which it ran to prove that the transaction was merely a pretended sale.

5. CARRIERS—DUTY TO RECEIVE FREIGHT—PRIVATE SWITCHES.

A common carrier cannot be required to receive freight on or along a private switch, but its duty in that regard is confined and limited to its own depots or shipping and receiving points.

---

* For opinion of Circuit Court of Appeals, see 134 Fed. 64.

6. EASEMENTS — RIGHTS OF INGRESS AND EGRESS — USE OF ARTIFICIAL APPLI-ANCES.

While the owners of cutting-stone rights have the right of ingress and egress for their stone, yet such right does not entitle them to the use of structures and facilities, such as a railroad track, erected by the owner of the servient estate for his own use, unless they acquire such right by private negotiations or by proper condemnation proceedings.

7. SAME—USE OF ANOTHER'S APPLIANCES—ABSENCE OF INCONVENIENCE.

The fact that the owner of cutting-stone rights could use a private side track constructed on the land of the owner of the servient estate without any inconvenience to the latter does not give him any legal or equitable right to require the latter to afford him such use.

8. INJUNCTIONS—PROCEEDINGS IN STATE COURTS—INTERFERENCE BY FEDERAL COURTS.

A decree of the Circuit Court enjoining a party from setting up any claim to the right to use a railroad switch which the state court had held that he was entitled to use is not an injunction of proceedings in the state court, in violation of Rev. St. § 720 [U. S. Comp. St. 1901, p. 581], where, since the decision of the state court was made, the railroad had sold the switch to a private owner, at whose instance the injunction was obtained.

[Ed. Note.—Federal courts enjoining proceedings in state courts, see notes to Garner v. Bank, 16 C. C. A. 90; Central Trust Co. v. Grantham, 27 C. C. A. 575; Copeland v. Bruning, 63 C. C. A. 437.]

9. JUDGMENTS—RES ADJUDICATA.

A judgment rendered on the merits by a court of competent jurisdiction in any proceeding at law or in equity precludes and bars subsequent litigation between the same parties or their privies on the same cause of action.

[Ed. Note.—For cases in point, see vol. 30, Cent. Dig. Judgment, §§ 1242–1253.]

10. SAME—SCOPE—ISSUES DETERMINED.

A judgment is conclusive between the parties and their privies not only as to the issues actually involved and determined, but also as to such issues as might have been raised upon the cause of action set up in the suit in which it was rendered.

[Ed. Note.—For cases in point, see vol. 30, Cent. Dig. Judgment, § 1241.]

11. SAME—AFTER-OCCURRING FACTS.

A judgment is conclusive only as to the matters capable of being controverted between the parties at the time and as to the conditions then existing, and cannot operate as an estoppel as to after-occurring facts, not involved in the suit in which the judgment was rendered.

[Ed. Note.—For cases in point, see vol. 30, Cent. Dig. Judgment, § 1267.]

12. QUIETING TITLE—REMOVAL OF CLOUD—DECREE—SCOPE.

An unfounded claim by an owner of cutting-stone rights to the right to use a side track built by the owner of the land constitutes a cloud on the latter's title, which he may have removed by a decree quieting the title, and enjoining the claimant from ever again making the claim; but the decree should clearly and explicitly exempt from its operation the right of the claimant to exercise his cutting-stone rights and his right to the use of the surface of the land in all such reasonable ways as may be necessary to make such right effective.

Bodley, Baskin & Flexner, for complainant.
Lewis McQuown and Wright & McElroy, for defendants.

EVANS, District Judge.   Through the medium of certain conveyances, the complainant became the owner in fee of part of all of a certain tract of land in Warren county, Ky., known in this and a former litigation as the "Loving Tract."   Some years previous the defendants or their ancestor had purchased an easement therein described as the

undivided one-third of the cutting-stone rights in the land. In a proceeding in the Warren circuit court a division was had between the co-owners of the cutting-stone rights, and the share of the defendants therein according to the division thereafter made was confined to certain portions of the lands described in the plat of it as Nos. 2 and 4, though a small part (150 feet) on the eastern front of No. 4 was yielded to the complainant. Other parts of the land—especially a lot known as No. 1—were not included in the portion allotted to the defendants. The order of the Warren circuit court directing the division by the commissioners, which order was made December 22, 1900, contained a clause in this language:

"In dividing the knob land said commissioners shall take into consideration the accessibility of those portions allotted to each party to the railroad running from Memphis Junction to the White Stone Quarry, and shall, as far as possible, so divide said land as to render each portion thereof into which it is divided equally accessible to said railroad."

The deed of the commissioners who made the division contained this clause:

"It is especially understood and agreed in the foregoing conveyances, that only the cutting-stone right or interest in said land is conveyed to said parties, and no right or claim therein other than the cutting stone is conveyed. Each of said parties takes the cutting stone in the land described above as conveyed to it or her, and no other right or interest in the land is conveyed or waived by either party, but each holds and maintains its ownership except as to the cutting stone therein as is now vested, or may hereafter be vested in said parties."

A certain agreement, without date, but probably made in 1901, between the parties in interest, in respect to the division, contains the following clause:

"In this agreement and division it is distinctly understood that nothing is granted save the cutting stone in the lands above described. So far as other rights and interests are concerned each party holds and maintains its ownership therein as is now vested in said parties respectively."

Under certain other agreements between various persons previously interested, a railroad track was laid many years ago by the Louisville & Nashville Railroad Company, extending from its main line, near Memphis Junction, to the quarries now owned by the complainant. This track, up to a few months ago, was owned by the railroad company, and was operated by it under certain agreements found in the record; but the railroad company only owned the superstructure, and not the land on which it was erected. This track extended over lot No. 1, and nearly across lot No. 4. The defendants opened a quarry on lot No. 2, not far from the end of the railroad track on No. 4, and claimed that they had the right, upon the facts disclosed by the record, to bring their stone to the railroad track on that lot, and that it was the duty of the railroad company to give them facilities for its transportation equal to those afforded to the complainant. In this situation the complainant brought a suit in equity in the Warren circuit court against the defendants in the present suit and others to secure an adjudication of its rights. The result of that suit, as finally settled in the fore part of 1903, was a judgment to the effect, first, that the defendants did not own, nor have any interest in, the railroad, either on lot No. 1 or

lot No. 4, or anywhere else, notwithstanding the clauses above recited as having been contained in the commissioners' deed, and in the agreement without date, and in the order of the Warren circuit court directing the division of the cutting-stone rights; second, that the railroad company, being a common carrier, was, as such, bound to furnish to the defendants facilities for the transportation of their stone upon an equality with the complainant; but, third, though not expressly, it was necessarily, and in the nature of the case, confined to the time when the railroad company should own or operate the track. The judgment unquestionably adjudicated and settled the rights and duties of the litigants in that suit up to July, 1903, and would have settled them for all time to come if the then existing status had continued. But it did not continue. Some time after that judgment was made final, the complainant and the railroad company abrogated the agreement referred to in the opinion of the Court of Appeals as to the track on lots Nos. 1 and 4, as unquestionably they had the right to do, and the complainant purchased from the railroad company all those portions of the track, and became thenceforward the sole owner thereof; leaving in the railroad company neither ownership in it, nor management or control over it. Nor after that date did the railroad company operate or manage that portion of the track, nor claim or exercise the right to do so. The defendants, however, continued to insist that they had the right to have their stone and other freight transported over the track on lots Nos. 1 and 4, and the complainant brought this action to obtain the relief asked in the prayer of the bill of complaint as amended.

The complainant, on such partial presentation of the case as could be made by ex parte affidavits, asked a temporary injunction pendente lite. After a most painstaking consideration, the court on January 26, 1904, delivered an opinion dealing with the case as then developed.

To that opinion it fully adheres, after a further and very industrious reinvestigation of the case. That opinion, as far as it goes, expresses our view upon the questions then presented, and makes it unnecessary again to go into details upon the propositions then discussed, though some others have risen at the final trial which must also be dealt with.

1. In the suit in the state court the defendants Oman filed an answer which they made a cross-petition against the Louisville & Nashville Railroad Company and others; and upon the issues raised on that pleading the state circuit court, inter alia, adjudged that:

"The defendant the Louisville & Nashville Railroad Company is ordered and enjoined to haul and carry for said defendants Oman such supplies and other stores as said defendants may demand, from the Memphis Junction of the Louisville & Nashville Railroad Company to said Omans' quarry land on the railroad as now constructed into the land allotted to said Omans in the division between the said Omans and the Bowling Green Stone Company, and to haul and carry for said Omans the product of their said quarry over said road to Memphis Junction."

The judgment upon those issues was affirmed by the Court of Appeals (115 Ky. 369, 73 S. W. 1038), and Judge Barker, in delivering its opinion, said:

"We think, under his right to the cutting stone, as now fixed by contract, appellee is entitled to ship and receive freight at any reasonable point along the road as now constructed, which lies upon any part of the Loving tract,

which was set apart and conveyed to him in the settlement had between him and the Columbia Finance & Trust Company."

Upon this the defendants base one of their chief arguments against the relief sought by the complainant's bill. As said in my former opinion, if this were all, and if there had been no change of contract or of property rights, the matter would be closed against complainant by adjudication at the outset. But the Court of Appeals, when we consider its whole opinion, evidently regarded its general language as applicable only to the exact case before it, and expressly recognized the possibility of a change of the contract between the complainant and the railroad company. It will be observed that no time limit is fixed in the order, and it is open to the fair construction that, when such a change should be made, new relations and new rights would arise, and put an end to that extent to the operation of the injunction. In the present case, as pointed out in the former opinion, no relief is sought against the railroad company, nor will any attempt be made by this court to interfere with the state court's injunction now resting upon the railroad company. That is a matter with which the state court alone is concerned, and must be settled by it. But I may be permitted to renew an expression of doubt as to whether the state court will not itself feel that a new situation has arisen by the sale of the track on lots Nos. 1 and 4, and by the abrogation of the contract between complainant and the railroad company, which will cause that court to limit the general language above copied from its judgment, and confine the enforcement of its injunction within limits to be determined by the new situation, wherein the railroad company may have no right or power to use or operate the switch on lots Nos. 1 and 4 because of the abrogation of the contract which gave it the right to do so, and because it has sold the switch.

That the railroad company and the complainant were not bound to keep their contract in force for the benefit of the defendants is a conclusion sound of itself, and one that must follow from the ruling by the Court of Appeals that the defendants have no legal interest in the switch, emphasized by the fact that the court bases all the rights it gave to defendants, and all the duties it imposed on the railroad company, upon the fact that the latter was a common carrier operating the switch on those lots as part of its system. This was the only ground upon which the duty of the railroad company could be based, but when it ceased to own or operate the switch it had neither right nor power to use it. The right and power to use the switch had passed to another, and whether the state court will attempt to compel the carrier to use property to which it has no title or right, for the benefit of the defendants, is an important question for that court, and not for this. We have no part in it. But while these matters are exclusively for the state court to settle, so far as they may affect the railroad company, this court has been asked by the bill of complaint in this case to act upon the defendants, and compel them to desist from making certain claims to complainant's property. It is therefore the defendants, and not the railroad company, which this case may affect, and it is only the questions between the actual parties to this suit which we have endeavored to ascertain and determine.

The essential question may, we think, be thus stated: Whatever may be their rights as between themselves and the railroad company alone, have the defendants any right whatever to use or to compel the complainant to submit to the use by the common carrier for defendants' benefit of complainant's property, viz., its switch on lots Nos. 1 and 4? If the railroad company hauls freight for defendants, it must be allowed to collect tolls therefor; and thus we should have the carrier getting compensation for the use of the complainant's property not only without the latter's consent, but over its protest, and without a judicial proceeding of condemnation. This, we think, cannot be the law.

2. In the former opinion it was held that the defendants had no property interests in the railroad switch. This was res adjudicata in the suit in the state courts, and binding upon all parties and all courts. Judge Barker, in delivering the opinion of the Court of Appeals in the state court case in 1903, said:

"John Oman, having opened a quarry on the Loving tract, set apart to him, very near the quarry operated by the Bedford-Bowling Green Stone Company, is naturally very anxious to use the switch in transporting his machinery to his quarry, and in transporting his stone to the main line of the Louisville & Nashville Railroad; it being impracticable to haul such heavy freight for so long a distance in any other way. We do not think, however, he has any interest in the switch in question. It was built by the White Stone Quarry Company, a remote vendor of appellants, under the lease of 1870, and that instrument contains no covenant for its conveyance to the lessors at its expiration, at which time, being part of the realty, in the absence of any stipulation governing the matter it became the property of the owners of the soil to which it was affixed. In order for appellee Oman to prove himself entitled to an interest in the railroad switch involved in this litigation, it was incumbent upon him to exhibit some muniment of title by which he acquired an interest in it. This he has wholly failed to do. Even should it be held that his remote vendor, B. C. Sanders, acquired an interest by the terms of the lease of 1870, it would still be necessary for him to show transmission of that right to him. He purchased the interest he holds at a judicial sale in the settlement of Milton Feland's estate, and the deed of the commissioner of the court in that case to him, after describing the land containing the cutting stone to be conveyed, contains this stipulation: 'That which is conveyed is the interest of M. C. Feland, in the cutting stone on the land aforesaid, being one-third interest.' So that all he purchased was an interest in the cutting stone, and not an interest in the railroad switch."

3. The Louisville & Nashville Railroad Company is so obviously a common carrier that the proposition needs no remark, but it had built, and, up to the final decision in the state court case, had owned and operated, the track on lots Nos. 1 and 4, under certain contracts exhibited in the record. And so Judge Barker, in the opinion referred to, said:

"This contract, and other evidence in the record bearing upon the question, shows that the Louisville & Nashville Railroad Company, during the continuance of this last contract, has the control and management of the railroad switch. It owns, controls, and operates the engines and other rolling stock which pass over the line. It keeps the roadbed in repair, and owns all of the material which goes into it. So far as this record shows, it exercises the same control and dominion over this line that it does over any other part of its system, and we think, by the terms of the contract in question, the switch, during the continuance of the contract, at least, became a part of the general system of the Louisville & Nashville Railroad Company. This being so, it

cannot lawfully refuse to receive and transport freight belonging to appellees to and from such reasonable points along the line at which they may lawfully ship or receive it. * * * While it is the duty of the railroad company thus to receive and transfer freight for the appellee, this can be done only at points along the line of the railroad switch in question at which appellee may lawfully receive or ship it. He has no right to trespass upon the private property of appellants in order to reach the road."

Here the exact grounds of the court's ruling on this proposition are stated, and, as already observed, if that status had remained, there would have been no room for the pending suit. Every question in it would have been settled by final adjudication. But it will be observed that the learned judge appears to limit the then existing status by the language "during the existence of the contract." This was an unavoidable result. This contract was abrogated in June or July, 1903, and, of course, ended the status, unless something legally similar took its place. The court now finds, from the preponderance of the testimony, that nothing substantially or legally similar did take its place. It seems to us now, upon the fact shown by the testimony, that the railroad track on lots Nos. 1 and 2 is nothing more or less than a private switch belonging to the complainant, and that it is used only as such in the ordinary way of such switches, and that it is not owned, operated, controlled, or managed by the railroad company. If this be true, then it follows that the questions involved in the pending litigation, viz., those arising out of the ownership of the track on lots Nos. 1 and 4, by the complainant by its purchase from the railroad company, were neither litigated nor determined, and could not have been litigated or determined, in the suit in the state court, and consequently that they are entirely open for contestation in this suit. I can see no reason for doubting this, inasmuch as the ownership of the property changed after the conclusion of the former litigation, and the rights now in contention arise out of that subsequent sale. Having sold the switch, the railroad company has no power or right, for its own profit, to use it as it pleases, either as a carrier or otherwise.

4. If, as we have found to be a fact, the track on lots Nos. 1 and 4 is a private switch, and the sole property of the complainant, in which the railroad company has no interest, and over which it exercises no control or management, then, as the Court of Appeals has determined that the defendants have no property interests therein, it follows that they have no right, after hauling their stone on lots Nos. 1 and 4, to demand that the railroad company shall then have the right to take it from them on either of said lots, and transport it over the complainant track to that of the railroad company at the eastern line of lot No. 1. The court finds from the testimony that the railroad company's line now terminates at the point last mentioned, to wit, the eastern line of lot No. 1, or, rather, at the southeastern corner of that lot, and that it does not own or operate any railroad beyond that point, or over any part of lots Nos. 1 and 4. That the defendants cannot compel either the complainant or the railroad company to transport the defendants' stone or other freight over the track on lots Nos. 1 and 4 must necessarily be the result, unless the defendants have some rights, legal or equitable, to compel the complainant and the railroad company to keep alive their contract for the benefit of the defendants, although the parties

thereto themselves wish to abrogate that contract. In the former opinion delivered herein, we endeavored to show that the defendants have no right to insist that that contract should be kept alive for their benefit. We adhere to the views then expressed, especially where it was said:

"If the defendants had any legal or equitable title to the switch, or any part of it; if they had paid any part of the cost of constructing the same; if they had done anything more meritorious in the premises than to cherish a desire to use the switch for their own benefit, without contributing to the expense of its construction and maintenance—I should be inclined to overrule the motion for an injunction, as in that event they would then have what now they have not, namely, an equitable interest in the switch. But as the defendants have no title to the switch, and have paid no part of the costs thereof, there seems to be little or no merit in any claim they may make to a right to use another person's property."

5. By the provisions of the contract between the complainant and the railroad company dated February 28, 1901, there might be a cancellation thereof, and in that event it was provided:

"In case this contract should be canceled in the manner above provided the said Bedford-Bowling Green Stone Company is hereby given the right to purchase the material in said track by paying in cash to the Louisville & Nashville Railroad Company within sixty days from the receipt of notice of cancellation the value of said material, and should the Bedford-Bowling Green Stone Company fail to exercise its option to purchase said material, then the said Louisville & Nashville Railroad Company hereby reserves and is given the right to take up and remove said material without let or hindrance on the part of said Bedford-Bowling Green Stone Company, or any other person."

On the 29th day of June, 1903, that contract was canceled by mutual written agreement of the parties, and all the material in the track on lots Nos. 1 and 4 was purchased by the complainant from the railroad company. The question of whether the sale to the complainant by the railroad company was a real or a pretended transaction may be easily disposed of. It is hardly a badge of fraud that the purchase price was not paid in cash. The parties, being sui juris, had the right and power to arrange this to suit themselves, even if it did change the terms mentioned in the contract of 1901. That it was intended to be so paid is evident. But if the parties agreed to an extension, and to a promissory note for the price, it is no concern of the defendants. We cannot properly say that the preponderance of the evidence overcomes the presumption of fairness, or supports the suspicions of the defendants. They charge and they must prove the characteristics they impute to the sale. The burden upon this phase of the case is upon the defendants, and we are clearly of opinion that they have not sustained their view. As the complainant and the railroad company had the right to make the contract of sale, their exercise of that right cannot be successfully questioned by an outsider, unless upon the clearest grounds. And if the right to make the contract existed, the motives of the parties became immaterial. McDonald v. Smally, 1 Pet. 620, 7 L. Ed. 287; South Dakota v. North Carolina, 192 U. S. 310, 311, 24 Sup. Ct. 269, 48 L. Ed. 448. Of course, if the railroad company had had no right to abrogate its contract with the complainant, and if the parties thereto did not have the right to abrogate that contract, and if the complainant had no right to buy the track on those lots from the railroad company, then different results might follow; but if the railroad

company had the right to sell the material in the switch, and the right to abrogate the then existing contract, we cannot say from the evidence that there was in fact no sale made, or that there was no abrogation of the contract existing between the parties, and which, on its face, plainly stipulated for such abrogation.

6. A common carrier cannot be required to receive freight on or along a private switch. Its duty in that regard is confined and limited to its own depots or shipping or receiving points. Hence the reasonableness of the expressions in the opinion of the Court of Appeals above copied, wherein it is said, first, that the railroad company "cannot lawfully refuse to receive and transport freight belonging to appellees to and from such reasonable points along the line at which they may lawfully ship or receive it"; and, second, "while it is the duty of the railroad company thus to receive and transport freight for appellee, this can be done only at points along the line of the railroad switch in question at which appellee may lawfully receive and ship it. He has no right to trespass upon the private property of appellants in order to reach the road."

7. But the Court of Appeals, in its opinion, said:

"Although the part of the Loving tract upon which the railroad switch lies (being No. 4 on plat) is now owned in fee by appellants Bedford-Bowling Green Stone Company, the right to take the cutting stone which belongs to appellee necessarily carries with it such reasonable use of the surface over the stone, as is necessary to make appellee's interest in the land available."

It doubtless goes without saying that the defendants, as owners of the cutting-stone rights on lots Nos. 2 and 4, ex necessitate rei have the right of ingress and egress. That right is essential to the enjoyment of their grant, and, besides being finally adjudicated by the Court of Appeals, is per se obvious. Furthermore, and upon the same grounds, the defendants are entitled to such reasonable use of the surface over the stone on lot No. 4 as may be necessary to the same ends. All of this, however, refers to the surface over the stone. The rights referred to might, in this advanced day and generation, be regarded as necessarily including the right to build railroad tracks, tramways, roads, or bridges, within the meaning of the phrase "reasonable use of the surface over the stone." But if such structures are allowable or necessary for the purpose of making the cutting-stone rights available, the defendants must build and equip them at their own charges. Their right is to use the "surface over the stone." No court has held, and this court will not hold, as at present advised, that the defendants have the right to use the structures put upon that surface by others, or those purchased by others at their own expense, and for their own uses and purposes. I hold that the right to use the surface over the stone, and the right to ingress and egress, as to lots Nos. 1 and 4, do not give or include the right to use "structures" and facilities erected on that surface, and now owned by another, who is entitled to it for its own purposes. If the defendants require those structures in order to reach their quarry and enable them to ship their stone, they must either acquire a right to use those structures by private negotiation, or by a proper proceeding of condemnation. While it may, therefore, possibly be admissible for the defendants, if necessary to the enjoyment of their

134 F.—29

grants, to construct a railroad, tramway, road, or other means of making their grant available or profitable, it is wholly inadmissible for them to claim the right to use for their own purposes the structures now belonging to another, except upon condition that they purchase the right by agreement, or condemn and pay for it under section 815, Ky. St. 1903.

8. Much of the defendants' testimony bears upon an effort to show that there could easily be an extension of the track on lot No. 4 to the defendants' quarry, and that the track on that lot, without inconvenience to the complainant, could be used at least half of the time for defendants. But all of this is evidently immaterial, unless the defendants have some legal right to the track or to its use. The fact, if it be such, that the defendants could use complainant's property without injury or inconvenience to complainant, might appeal to the courtesy or generosity of the complainant; but surely it does not, under our imperfect system of laws, give to the defendants any legal or equitable rights which the courts can recognize or enforce.

9. Much proof was also introduced by defendants to show that the railroad company uses the track on lots Nos. 1 and 4 precisely as it did for many years prior to June, 1903. In a certain very superficial sense, this is true, because at times the railroad company, when requested by complainant, still sends its engines, with freight cars, along and over the track on those lots. But as already stated, the use of the track in that way is only very superficially similar to the previous use. The difference, in reality, is very great. The sending of engines and cars over a railroad track is practically the only use to which such a track is ever put, whether it be a railroad line, proper, or a mere private switch, and all such use is practically the same, especially to the view of a mere outside observer; but in this case the railroad track was owned by the railroad company previous to July, 1903. That company could repair, raise, lower, change, or remove it at will. Now it can do none of those things. Before that time it had the exclusive right and power to send its engines and cars over the track, either on a regular schedule or otherwise, as it might determine. Now it has no such right. Before that time it had the complete control and management of the track, and this is the very essence of "operating" a railroad, and in this sense we use that word in the connection in which it is found in the opinion of the Court of Appeals. Now the railroad company does not control or manage the track on lots Nos. 1 and 2, and has no authority over it. Consequently it does not "operate" it, and has not done so since a time antedating the commencement of this suit.

10. The railroad company does not, as we have seen, now "own," and cannot in any fair or legal sense be said to "operate"—that is to say, authoritatively control or manage—what we have concluded to be the private switch on lots Nos. 1 and 4. As is no doubt the case in respect to other private switches, the carrier, when informed by the owner of the switch that it has freight to ship, and when requested to furnish cars for the purpose, does so by sending empty ones, which, after being loaded, are hauled away. This is a desirable business arrangement, suggested by prudence and foresight. Such arrangements require expensive structures. The switch in this case is obviously necessary to

complainant's business. It was bought by complainant for use in that business, and, while the court sees the difficulties of defendants' position, it finds no law which imposes either a legal or equitable obligation upon the complainant to furnish the use of that switch to the defendants free of cost. As already stated, the expenses for furnishing the use of the switch to the defendants must be settled by agreement of the parties, or through the medium of a condemnation proceeding. These results necessarily follow from the complainant's ownership of the switch.

11. Upon the question of res adjudicata, it may specially be remarked that in the suit in the state court one question was whether the railroad company, a common carrier, should devote its track on lots Nos. 1 and 4 to the uses of the shipping public—the defendants equally with others. That question was adjudicated in the affirmative. The ratio decidendi was the carrier's ownership and operation of the line. When, as here, that reason ceases, the rule ceases, of course. In this suit the entirely different question is, shall the railroad company be compelled or permitted to use as its own, for the benefit of the defendants and itself, as a common carrier, certain property which it has sold to the complainant, and which the railroad company no longer either owns, controls, or operates. That question, as we have seen, was neither raised nor adjudicated in the suit in the state court, and could not have been raised. It is therefore open for adjudication here, and must be determined. Under the mandatory injunction from the state court, the railroad company must receive freight from defendants for shipment at all points on its line where it may lawfully receive or ship freight. That injunction is still in full force, as against the railroad company, to whatever extent the state court may adjudge; but we hold, under the entirely new case now presented, that the defendants have no right to use, or to claim the right to use, or have used for their benefit, the switch on lots Nos. 1 and 4. This ruling in no way conflicts with that of the state court in the case actually before it, for the railroad company then owned the switch, which has since become the complainant's property, with all that this implies. Nor can either the defendants or the railroad company lawfully trespass on what is now complainant's property in order to ship defendants' stone.

12. It is still vigorously insisted that to grant the relief prayed for, so far, at least, as an injunction is concerned, would violate section 720, Rev. St. U. S. [U. S. Comp. St. 1901, p. 581], by enjoining proceedings in a state court. We endeavored to state with clearness our views on this proposition in the previous opinion, and will not repeat what was then said. While it is true that the defendants could not claim the right to use the railroad track on lots Nos. 1 and 4 if the injunction in this case should be permanently continued, and would thus be unable to ship freight over it, this would not result from enjoining any proceeding in the state court, but would come from enjoining the defendants personally from interfering with the rights of the complainant by using or causing to be used its property acquired after the judgment in the state court; such requirement being in no way contrary to the judgment of that court, and in no way being in conflict therewith. If the state court had, in substance or form, enjoined the railroad company

from ceasing to operate or from selling the track on lots Nos. 1 and 4, the case would be different; but the state court certainly did nothing of that sort, and left the complainant and the railroad company free to make the contracts entered into by them in June or July, 1903. To the utmost extent that the railroad company "operates" or "owns" a railway in the direction of the defendants' quarries, it is bound to afford defendants facilities for transporting freight equal to those furnished complainant. The judgment in the state court did not go further and require the railroad company to continue to operate any part of its lines.

13. The learned counsel for defendants, in their very able arguments, seek to base defendants' right to the use of the railroad track on lots Nos. 1 and 4 upon the clause contained in the order made in 1900 by the state court in the division suit, and upon the clause in the commissioner's deed made thereunder, and upon the clause in the unsigned stipulation, which have been set out in full in the opening portions of this opinion. Those matters were before the Court of Appeals, but, notwithstanding their terms, that court adjudged that the defendants had no legal interest whatever in the railroad track, and thus foreclosed that claim of the defendants. The duty of the railroad company was ascertained and fixed upon the general principles of law applicable to common carriers, as supplemented by the provision of the Kentucky Constitution and laws. Those duties relate only to the lines of railway which the railroad company owns or operates, and thus, as ever, we are brought back to the question of fact, viz., does the railroad company operate—that is, authoritatively control and manage—the track on lots Nos. 1 and 4?

14. The general rules of law applicable to this case are so well settled as in many respects to have become elementary. They may be stated as follows:

(1) The judgment of a court of competent jurisdiction in any proceeding at law or in equity precludes and bars all subsequent litigation between the same parties or their privies upon the same cause of action, provided the judgment was upon the merits of the controversy.

(2) The rule extends not only to the issues actually involved and determined, but also to such as might have been made upon the cause of action set up in the first suit.

(3) But in the language of the authors, found on page 777, vol. 24 (2d Ed.), of the American & English Encyclopædia of Law, these general principles are modified "by changes of condition." They say:

"And an adjudication is conclusive only as to those matters capable of being controverted between the parties at the time, and as to conditions then existing, and cannot operate as an estoppel to another action or proceeding, which, though involving the same rights passed upon, is yet predicated upon facts that have arisen subsequent to the former adjudication."

(4) In 2 Black on Judgments, in section 617, is found this language:

"Of course, a judgment being conclusive only upon matters within the issues, it is not an estoppel as to after-occurring facts, not involved in the suit in which the judgment was rendered."

(5) In the case of Third National Bank v. Stone, 174 U. S. 434, 19 Sup. Ct. 759, 43 L. Ed. 1035, it was held that a question cannot be held

to have been adjudged before an issue on the subject could possibly have arisen.

(6) The following cases decided by the Supreme Court of the United States and the Court of Appeals of Kentucky establish indubitably the proposition that in a case like this the adjudication in the state court in the first suit can operate as an estoppel only to the extent that it decided questions that may to some extent, at least, be involved in this suit. They seem to the court fully to sustain the position it has taken in this opinion: Jones v. Commercial Bank, 78 Ky. 423, 424; Cromwell v. Sac County, 94 U. S. 353, 24 L. Ed. 175; Wilmington R. Co. v. Alsbrook, 146 U. S. 302, 13 Sup. Ct. 72, 36 L. Ed. 972; Dennison v. United States, 168 U. S. 249, 18 Sup. Ct. 57, 42 L. Ed. 453; Nesbit v. Riverside Independent District, 144 U. S. 618, 12 Sup. Ct. 746, 36 L. Ed. 562; Davis v. Brown, 94 U. S. 428, 24 L. Ed. 204; Roberts v. Northern Pacific R. R., 158 U. S. 27, 15 Sup. Ct. 756, 39 L. Ed. 873. Many cases to the same effect are collected in Rose's Notes on United States Reports.

15. We have considered fully all the contentions of the defendants, and find ourselves somewhat unwillingly brought to the conclusions we have stated. It only remains to be seen what relief is to be given under the bill. The complainant has the legal title to the lands embraced in lots Nos. 1 and 4, subject to a stone-cutting easement in the greater part of lot No. 4. It has the actual possession of both lots. The legal title and possession referred to include the railroad track constructed on those lots, that track having become by the sale to complainant a part of the freehold. It is quite clear from the pleadings and contentions of the parties that defendants claim the right to have the use of the railroad track on the two lots, although John Oman, in his deposition, attempts to disguise it by claiming it over the shoulders of the railroad company as a carrier. But however attempted to be disguised, the fact is clear that defendants do claim the right to have the railroad track now on lots Nos. 1 and 4 subjected to their uses for the transportation of the stone quarried by them from the Loving land. To this we think they have no just right, as against the complainant; and the unfounded claim is a cloud on complainant's title, which it has the right to have removed, and its title quieted in respect thereto. If the defendants do not make the claim we have described, there was no necessity or propriety in the vigorous defense and elaborate preparation shown by the large record in this case. The complainant is entitled, as we conceive, to a decree quieting its title and removing the cloud referred to, and to an injunction perpetually restraining the defendants, and each of them, from ever again making said claim. But the judgment should clearly and explicitly exempt from its operation and from the operation of the injunction the right of the defendants, and each of them, to reasonably excavate for and cut and remove the stone from those portions of lot No. 4 in which they have the exclusive cutting-stone rights; also the defendants' right to full and free ingress thereto for those purposes at all times, and to full and free egress therefrom, and the right to use the surface over the stone in said land in which they own the cutting-stone rights in all such reasonable ways as may be necessary to make those rights effective. All of these things as to

lot No. 4 should be explicitly secured to the defendants and reserved to them in the judgment. The judgment should also explicitly disclaim any right or purpose of this court in any wise to interfere with the injunction against the Louisville & Nashville Railroad Company covered by the judgment of the state court.

As the defendants did not disavow nor attempt to disavow in their answer their said claim to have said railroad track on lots Nos. 1 and 4 used for their benefit in the way indicated, they must be charged with the costs of the action.

Judgment accordingly may be prepared and submitted.