## WILLIAMS et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 5804.

Circuit Court of Appeals, Fifth Circuit.

Nov. 22, 1930.

Robert Ash, of Washington, D. C. (T. J. Reilly, of Washington, D. C., on the brief), for appellants.

G. A. Youngquist, Asst. Atty. Gen., C. M. Charest, Counsel, Bureau of Internal Revenue, and R. L. Williams, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., J. Louis Monarch, William Cutler Thompson, and Hayner N. Larson, Sp. Assts. Atty. Gen. (M. M. Mahany, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C., on the brief), for appellee.

Before BRYAN and FOSTER, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

Plaintiffs are husband and wife, and prosecute this appeal from an adverse decision of the Board of Tax Appeals, increasing their assessment upon their interest in certain notes. The circumstances were as follows:

Williams was one of some thirty associates, who were represented by one of their number, Henry Hobbs, of Wichita Falls, Tex., in the execution of a contract dated November 25, 1919, to sell certain oil properties to C. N. Haskell, former Governor of Oklahoma, for the price of $3,200,000. Under the agreement with Haskell, Hobbs obligated himself to organize a common-law trust to be known as the Hobbs Oil Company, with a capital of $100,000, and to convey to it the major portion of the oil properties of himself and associates in return for the whole of its capital stock. Hobbs, as trustee, and Haskell further agreed to organize a corporation under the laws of the state of Delaware, to be known as the Texas Chief Oil Company, with an authorized capital stock of $6,000,000. Hobbs further obligated himself to convey to the last-mentioned company all of the stock of the Hobbs Oil Company (the common-law trust), together with 75 per cent. of the stock of the Texas Chief Oil & Gas Company, another common-law trust, which held the title to the remainder of the oil properties belonging to Hobbs and his associates. The consideration which Hobbs was to receive for the stock of the two common-law trusts just mentioned was $4,000,000 of the capital stock of the Texas Chief Oil Company, the Delaware corporation. Haskell bound himself to purchase for $3,200,000 all of this latter stock from Hobbs and his associates, and it was agreed that the same should be placed in escrow in the Coal & Iron National Bank of New York, to be released to Haskell in installments as it was paid for, at par. The payments to be made by Haskell for the $3,200,000 stock of the Texas Chief Oil Company were in installments of $750,000 each, to be paid on the 15th of December, 1919, and the 15th day of January, February, and March, 1920, and the final payment of $200,000 on April 15, 1920.

Shortly after the execution of this contract, it developed that the properties were not as valuable as had been supposed, because of the falling off in oil production, and on December 11, 1919, a supplemental agreement was entered into, wherein it was provided that a test should be made over a period of fifteen and one-half days, and the price reduced ac-

cordingly. The result showed a marked decline, and the original price of $3,200,000 was reduced to $2,100,000.

By June, 1920, Haskell had paid $1,200,000 to Hobbs, which was considerably less than the stipulated installments would have amounted to, and on the 20th of that month a further arrangement was made, by which the Hobbs Oil Company (common-law trust), through Hobbs as president, executed to and in favor of Hobbs, as trustee for himself and associates, seven vendor's lien notes, aggregating $900,000, representing the balance due and secured by deed of trust upon all of the property owned by the Hobbs Oil Company, and which was the same as had been sold to it originally by Hobbs. The first three of these notes were for $100,000 each, and were due on July 20, August 20, and September 20, 1920, respectively, the fourth and fifth for $200,000 each, and matured on October and November 20, 1920, while the sixth and seventh were for $100,000 each, and both became due on December 20, 1920. All of them were negotiable except the last, which was made nonnegotiable because of certain litigation which was then pending between the states of Oklahoma and Texas as to the location of the state boundary line, which, if decided adversely to the latter, would have placed a small portion of the lands in Oklahoma, and have affected the title of the Hobbs Oil Company thereto. These notes were paid as follows: The first on July 26, 1920; the second and third on October 4, 1920; the fourth on October 20, 1920; $150,000 was paid on the fifth of November 20, 1920; and the remaining $50,000 on January 28, 1921, together with the full amount of the sixth, and three-fourths of the last note had been paid by 1924.

The interest of the plaintiffs in the unpaid portion of these notes on December 31, 1920 (which date was determinative of the tax liability), was $15,977.32. In making their returns for taxation purposes for the year 1920, the petitioners valued the first six notes, amounting to $800,000, as of June 20, 1920, the date they were given, at $162,000, which they claimed was the fair market value of the property covered by the mortgage. By calculating the interest which they had therein on this basis, they arrived at an income to be taxed of $3,235. Upon a re-audit by the Commissioner, the notes were given their full face value, which resulted in an increase for taxation purposes of the income of petitioners to $15,977.32. Upon appeal to the Board of Tax Appeals, this ruling was affirmed.

Appellants contend that the Board of Tax Appeals erred in disregarding the uncontradicted evidence to the effect that the notes were not worth in excess of $162,000 as of June 20, 1920. The provision of the statute involved is section 202 (b) of the Revenue Act of 1918 (40 Stat. 1060), which reads as follows:

"When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any."

Of course, the fair market value of the notes at the time of their execution should be the basis for determining the tax. The finding of the Commissioner on the question of value is prima facie correct. Wickwire v. Reinecke, 275 U. S. 101, 48 S. Ct. 43, 72 L. Ed. 184; Avery v. Commissioner (C. C. A.) 22 F.(2d) 6, 55 A. L. R. 1277. Hence the burden was upon the petitioners to produce evidence sufficient to overcome this presumption and to show the correct value upon which the tax should be assessed. Reinecke v. Spalding, 280 U. S. 227, 50 S. Ct. 96, 74 L. Ed. 385; U. S. v. Anderson, 269 U. S. 422, 46 S. Ct. 131, 70 L. Ed. 347; Bishoff v. Commissioner (C. C. A.) 27 F.(2d) 91; Anderson v. Farmers' Loan & Trust Co. (C. C. A.) 241 F. 322.

Petitioners seek to have the value of these notes determined solely upon the basis of the daily production of oil from that part of the property covered by the mortgage which had been developed together with the testimony of two witnesses, the first of whom said: "The notes did not have any collateral behind them beside what has been spoken of (producing oil property) and there were no other assets that could have been looked to for payment of the notes, which could have been foreclosed upon in event of failure to pay the notes," and the second, who stated that "at the time the notes were taken the witness did not believe they were worth the face value. They were taken because it was the only thing they had to get the money out of the property, which had been sold to Gov. Haskell. It was all the Hobbs Oil Company owned." However, the record shows, as the Board of Tax Appeals found, that "the property in question covered thousands of acres of land." No showing was made as to the financial status of the Hobbs Oil Company, maker of the notes, as to whether it had a surplus or funds in its treasury, or as to the actual value of the leases in what was termed the "wild cat territory," nor did the petition-

ers offer any evidence as to the possibilities of further development of the proven lands. It further appears from the record that at a meeting of the board of trustees of the Hobbs Oil Company on June 20, 1920, the date of the execution of these notes, there was placed before it a resolution of the Texas Chief Oil Company, to which all of the stock of the Hobbs Oil Company and 75 per cent. of the Texas Chief Oil & Gas Company (common-law trust) had been conveyed (the latter owning other properties than those of the Hobbs Oil Company), passed on June 18th, "relating to the payment of the balance due Henry Hobbs under original contract of purchase," and from which it appeared "that the Texas Chief Oil Company, a Delaware corporation, owner of practically all of the stock of the said Hobbs Oil Company, had agreed to provide for each and all of said notes" (the notes involved in the present cause). The resolution which is referred to in the minutes of the meeting of the board of trustees of the Hobbs Oil Company was not produced, nor was any explanation offered of the apparent assumption by the Texas Chief Oil Company of the obligation to pay these notes. As pointed out by the Board of Tax Appeals, the Hobbs Oil Company was a subsidiary of the Texas Chief Oil Company, the latter owning all of its stock, and therefore presumably having sufficient interest justifying the assumption of these obligations. Nothing appears as to the financial responsibility of the Texas Chief Oil Company. Then, too, Haskell had put into the transaction, including the Hobbs Oil properties, $1,200,000, and there existed, therefore, a very strong incentive on his part to protect this investment by payment of the balance represented by the notes aggregating $900,000 given on June 20, 1920.

Of course, the market value of the notes was whatever a purchaser, willing and able to buy, would have paid therefor at that time, and we think his judgment would necessarily have been affected, not alone by the actual production of oil, but by all of the other considerations above mentioned, which we must assume would have been made known to him. We think the appellants not only have failed to overcome the prima facie presumption of correctness of the finding of the Commissioner, but also have fallen far short of sustaining the figures asserted as the basis for the assessment claimed by them, and the decision appealed from is therefore affirmed.

Petition denied.