## WALLS v. COMMISSIONER OF INTERNAL REVENUE.

No. 547.

Circuit Court of Appeals, Tenth Circuit.

July 5, 1932.

C. R. Ellery, of Cheyenne, Wyo., for petitioner.

Helen R. Carloss, of Washington, D. C., for respondent.

Before LEWIS and McDERMOTT, Circuit Judges, and POLLOCK, District Judge.

POLLOCK, District Judge.

The facts material on this appeal are: One T. Joe Cahill and the Midwest Refining Company got into a controversy in 1923 between themselves and with the state board of land commissioners of Wyoming over the right to lease and operate upon certain land belonging to said state. Their differences were adjusted by a contract April 19, 1925, by which it was agreed that, if a lease should be granted to the Midwest Company, said company would pay to Cahill and his assigns one-third of the net profits from the operations. It was further provided that the total expense of production, exclusive of taxes and drilling new wells, would not exceed in any one year an average of $1500 per month, and that no more than $500 per month would be charged against Cahill's interest, but, if one-third of the actual expense did exceed $500, the amount over could be charged against Cahill's interest the next month, provided the total yearly charge against his interest should not exceed $6,000.

There were other provisions in the contract, but this is sufficient to illustrate the nature of the agreement. It was a working interest, as distinguished from a royalty interest, because Cahill would get no income unless the operations were profitable.

Soon after the contract was executed, Cahill assigned one-eighth of his one-third interest under the contract to the petitioner, Walls, who was a lawyer, for professional services. Petitioner did not resell his interest thus acquired, but held it with the intention of taking his proportion of the net profits over the term of the lease. During 1923 the Midwest Company paid petitioner $4,470.87 in monthly payments as his share of the profits, and continued to do so to the time of the hearing herein.

Petitioner did not prepare an income tax return for 1923. A deputy collector prepared a return for him, and determined that petitioner's interest under the contract had a fair market value of $16,500, which, included with other income, made his net taxable income total $32,741.51. Petitioner was also assessed 25 per cent. of the tax as a penalty.

Petitioner thereupon took an appeal to the Board of Tax Appeals, which held that petitioner's one-eighth interest in the working agreement had a fair market value of $16,-500, and should be included in the petitioner's income for 1923. The Board held that peti-

tioner was entitled to deduct from his income a pro rata part representing exhaustion of the value of the agreement spread over its term. Also petitioner was assessed with a 25 per cent. penalty for failure to file a return. The petitioner thereupon filed this petition for review.

The statutes and regulations relied upon by the parties and applicable in this case are:

Revenue Act of 1921, c. 136, 42 Stat. 227:

"Sec. 212. (a) That in the case of an individual the term 'net income' means the gross income as defined in section 213, less the deductions allowed by section 214. * * *

"Sec. 213. That for the purposes of this title (except as otherwise provided in section 233) the term 'gross income'—

"(a) Includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, * * * or gains or profits and income derived from any source whatever. The amount of all such items (except as provided in subdivision (e) of section 201) shall be included in the gross income for the taxable year in which received by the taxpayer, unless; under methods of accounting permitted under subdivision (b) of section 212, any such amounts are to be properly accounted for as of a different period; but * * * "

"Treasury Regulations 62:

"Art. 33. *Compensation paid other than in cash.*—Where services are paid for with something other than money, the fair market value, if readily realizable, of the thing taken in payment is the amount to be included as income. If the services were rendered at a stipulated price, in the absence of evidence to the contrary such price will be presumed to be the fair value of the compensation received. Compensation paid an employee of a corporation in its stock is to be treated as if the corporation sold the stock for its market value and paid the employee in cash. * * * "

The question or questions argued are:

Did petitioner's interest in the working agreement received as compensation for petitioner's services in 1923 have a fair market value, so that that value should be included in his gross income for that year?

If so, is the Board's determination that that interest had a fair market value of $16,500 supported by the evidence?

Petitioner testified as to the acquisition of his interest for professional services. He testified as to a verified letter that he filed with the Income Tax Unit:

"Q. In such statement, I note the following: 'This ⅛ of ⅓ interest had an estimated value of $16,500 and I have no doubt of my being able to sell it for such sum but I do not choose to sell my interest. I prefer to hold it and take my proportion of the net results of the operating under the lease over the period of five years, the time for which the lease runs.' State whether or not it was your intention in making that statement, to advise the Tax Unit that the interest at the time you acquired it had a fair market value of $16,500? A. It was not. May I add—it was an estimate placed upon the value of the interest, which sum I would ask for the interest if I offered it for sale.

"Q. Upon what premise did you make the statement: 'I have no doubt of my being able to sell it for such sum'? A. Well, I had heard that a like interest had been sold by Mr. Ridgely for a sum approximating $16,000, and I predicated that statement upon the inference that I might be able to sell it for a like sum if I desired to sell it. His interest was sold, as I understood it, to the Midwest Company. I thought I might be able to sell mine to that company, too."

Petitioner went on to explain that the interest had no market value, but was speculative for several reasons. The Midwest Company controlled the field, fixed the price of oil, and controlled the output. The company was able to charge petitioner's interest with operation expenses and diminish the return, and no one other than that company had sufficient knowledge of the field by which they could approximate the value of the interest here involved. The petitioner said that interests in oil leases are bought and sold frequently in Wyoming, but that each interest has a speculative value peculiar to itself. The witness said his interest was identical to that of Mr. Ridgely who sold to the Midwest for $16,500, and he thought he might have sold for that. However, he thought there was a relationship between Ridgely and that company which entered into their negotiations.

Mr. Ridgely testified for petitioner that he made the sale of his interest to the Midwest Company for $16,500; that the Midwest Company was the only possible purchaser of interests in that field; that there is no general market for oil leases or interests therein; that Mr. Bretschneider of the Midwest said they were buying his interest as an accommodation.

Mr. Connaghan testified for petitioner that there was no general market for royalty interests; that there is no market price, but the seller would have to find a buyer willing to buy, and the price would depend on how much he was willing to pay. "The value would depend on the structural conditions and the grade or quality of oil and its locations to the market, and the nature of the contract covering the royalty." The witness considered royalty interests extremely speculative.

For respondent, Mr. Rath, a geologist and appraiser employed by the Midwest Company, testified that by considering production, price of oil, geological conditions, money invested, and the nature of the agreement a value can be arrived at for royalty interests. There is more or less speculation about it. The witness said, "It is possible that a royalty interest might produce an income whereas a working interest on the same lease might never prove profitable." He said the Grass Creek field was a proven one.

Mr. Bretschneider, vice president of the Midwest Company, testified for respondent that he bought five one-eighth interests (identical with petitioner's) for $16,500 each; that the interests had a speculative value, but the company was willing to pay that amount; that a working interest is more speculative than a royalty interest. The witness said he had some negotiations with petitioner, without saying what they were. The witness said they made no general offer to buy the interests under the contract here involved, but he answered all inquiries by saying they would buy one-eighth interests for $16,500. It was less troublesome when the company owned all the interests in a lease.

Mr. Ballard, an expert oil and gas valuation engineer, testified for respondent that petitioner's interest had a value of $15,000. His estimate was based on geological information, the price of oil, past production, and the fact that it was in a proven field. Witness said he had clients who were willing to buy proven oil interests in Wyoming in 1923, and that proven oil land did have a fair market value in 1923.

It should be remembered that the Commissioner's determination that petitioner's interest had a fair market value of $16,500 was prima facie correct, and that the burden of proving absence of market value or of proving the incorrectness of the Commissioner's finding is on the petitioner. Wickwire v. Reinecke, 275 U. S. 101, 48 S. Ct. 43, 72 L. Ed. 184; Crook v. United States (C. C. A. 5) 30 F.(2d) 917; Williams v. Commissioner of Internal Revenue (C. C. A. 5) 45 F.(2d) 61. Also, findings of the Board of Tax Appeals stand if there is any competent evidence to sustain them. Prey Bros. Live Stock Commission Co. v. Commissioner of Internal Revenue (C. C. A. 10) 36 F.(2d) 326; F. G., Inc., v. Commissioner of Internal Revenue (C. C. A. 7) 47 F.(2d) 541.

Petitioner contends that the working interest he received did not have a readily realizable market value, and its value should not be included in his income, because his interest had no established price fixed by sales by many persons in the open market; because the interest could not be sold on the open market, but only to the Midwest Company; because the interest had a speculative value dependent upon production, price of oil, and other factors unknown or under the control of that company, so that a purchaser buying such an interest was simply speculating. Petitioner concedes that the interest he received was a property right of value, but says it was so uncertain and speculative that, unless it was sold and turned into money, it was contingent, so its value did not constitute income.

The argument that the interest of petitioner cannot be taxed as income because it did not have a fair market value in the sense of a price fixed by dealings in the open market is not sound. Judge Amidon, in North American Telegraph Co. v. Northern Pac. R. Co. (C. C. A. 8) 254 F. 417, notes that "market value" sometimes means the price established in a market, and again it means "the fair or reasonable value." He says, at page 418 of 254 F., of the opinion:

"The term 'market value,' as the words fairly import, indicates price established in a market where the article is dealt in by such a multitude of persons, and such a large number of transactions, as to standardize the price. Proof of such a market value can only be made by one of the recognized methods of proving the price current in a market. Individual dealings are not competent to prove it. The term is, however, frequently used in a figurative sense, as meaning the fair or reasonable value of the property—that is, such a value as the property would have if it were dealt in according to the practices of a market overt. This is the meaning which the term usually has when applied to real property. To prove market value when it is used in this secondary or figurative sense, it is proper to receive evidence of individual transactions, even offers made in good faith for property of like character, the nature of

**350**

the property, its location, its rental value, the uses to which it can be put, and all the manifold elements which are admissible to show the fair and reasonable value of property which is not so traded in as to give it a market value in the primary sense of the term. Private dealings in property can never be used to show market value in the primary sense, and, when used to show market value in the sense of fair and reasonable value, individual transactions can never be made the sole basis for ascertaining such value. No text-writer or court has been discovered which supports any such doctrine. The distinction between the two meanings attached to the term 'market value' is now found in the elementary works."

Like real property, the interest in the lease acquired by petitioner could never have a market value in the primary sense, unless the interest in the net profits was divided up into many parts which became widely held and were often bought and sold.

 In Eisner v. Macomber, 252 U. S. 189, 207, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, the court, in determining whether a stock dividend was subject to tax as income, emphasized that income was something of "exchangeable value" proceeding from the property (capital). The phrase "fair market value" was used in the Treasury Regulations to mean that, if a person received "something" for his services for which there was no market and which therefore had no exchange value, that "something" could not be considered as income.

In O'Meara v. Commissioner of Internal Revenue (C. C. A. 10) 34 F.(2d) 390, an appeal by the taxpayer from the Board of Tax Appeals, the taxpayer contended that stock received in exchange for oil leases had no fair market value. The court held that the taxpayer sustained the burden of showing the stock in question could not have been sold at a price approximating what the Commissioner determined to be its intrinsic value. The court seemed to base its decision that the stock did not have a fair market value on the fact that there was such a prejudice against the sale of such stock that it could not be sold. Therefore it did not have a value realizable in money's worth. The court recognizes that intrinsic value may be resorted to for establishing market value if there were no sales reflecting market value, but it must be shown there would be a market value if the stock were offered for sale.

In F. G., Inc., v. Commissioner of Internal Revenue (C. C. A. 7) 47 F.(2d) 541, it was urged that stock turned over to petitioner as commission had only possibilities and could not be said to have a fair market value of $10 per share as found by the Board of Tax Appeals. The court held that the evidence that some stock had been sold for $5 to $10 per share with other evidence indicated that the stock had some value. The court held that the Board's findings were sustained, apparently without any proof of a market value established by dealings in market overt.

In Williams v. Commissioner of Internal Revenue (C. C. A. 5) 45 F.(2d) 61, 63, the fair market value of notes secured by a lot of oil land, some of which was producing oil, was said to be "whatever a purchaser, willing and able to buy, would have paid therefor at that time." In holding that the prima facie presumption of correctness of the findings of the Commissioner as to market value of the notes was not overcome, the court says that his judgment would be affected not only by the actual production of oil, but by the financial condition of the market possibilities of future development of the land, etc.

In Commissioner of Internal Revenue v. Swenson (C. C. A. 5) 56 F.(2d) 544, 547 (March 5, 1932), the market value of certain shares of stock given in exchange for oil rights was determined by the Commissioner. The Board of Tax Appeals reversed the Commissioner on the theory that the property of the corporation issuing the stock, which was bought with the stock in question, had a purely speculative value which kept the stock from having a market value. The Court of Appeals held that the fact that some of the stock had been sold to selected persons at par, the fact the leases of oil rights were salable, the fact that explorations had been made, and the fact that the company had equipment used in drilling, all indicated that it was not mere guesswork to attribute a substantial money value to shares of stock in question. The court noted that "the law does not forbid the recognition of the proved exchangeable value of an asset because of the speculative nature of it."

See, also, Lamprecht v. Swiss Oil Corp. (C. C. A. 6) 32 F.(2d) 646; Collin v. Commissioner of Internal Revenue (C. C. A. 6) 32 F.(2d) 753.

From the above cases it appears that the term "fair market value" was used in the income tax statutes to mean exchangeable value, for, if a person could not realize a sum of money from the sale of property received by him, it was not proper to consider it as profit. The petitioner did not prove that the in-

terest received by him had no exchangeable value, and therefore did not overcome the presumption that the Commissioner's finding was correct. Rather, there was evidence that supported the finding of the Commissioner and of the Board. It was inherent in the nature of petitioner's interest that it could not have a market value in the sense petitioner contends it should have before he could be taxed.

The action of the Board of Tax Appeals is affirmed.