Charles C. CLARK, and wife, Emma Lee Clark, McNutt Clark and wife, Troy Clark, and Estate of Lina B. Clark, Deceased, Charles C. and McNutt Clark, Co-Executors

v.

UNITED STATES of America.

Civ. A. No. 4170.

United States District Court
E. D. Tennessee, N. D.

Nov. 15, 1961.

John Y. Merrell, Washington, D. C., Ben W. Kiser, Maryville, Tenn., for plaintiffs.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., for defendant.

ROBERT L. TAYLOR, Chief Judge.

This case presents the recurring question of whether income derived from the sale of inherited land by subdividing into lots should be treated as ordinary income or as capital gains for the purpose of taxation.

Many of the pertinent facts have been stipulated.

Plaintiffs, Charles C. and Emma Clark, are husband and wife as are McNutt and Troy Clark. Charles C. and McNutt Clark are the co-executors of the estate of their deceased mother, Lina B. Clark, who passed away in April, 1959. All of the plaintiffs are residents of Blount County, Tennessee.

The action was filed to recover taxes paid by plaintiffs for the calendar years 1956, 1957 and 1958.

Jurisdiction is derived from Sections 1346(a) and 1402(a) of Title 28 U.S.C.

Plaintiffs filed their income tax returns with the District Director of Internal Revenue for the years in question and paid the taxes shown to be due thereon.

Prior to her death, Lina B. Clark filed timely federal income tax returns with the Director at Nashville and paid the taxes shown to be due.

Lina B. Clark inherited a life estate in a 115.72 acre farm of which her husband died seized in 1954, and her two sons, Charles C. and McNutt Clark, inherited the remainder interest in the farm.

Sometime after the death of the husband and father, the parties decided to subdivide the parcel of land into lots

and to sell it in that form. Pursuant to this decision, lots were sold in the years 1955, 1956, 1957 and 1958. Plaintiffs reported their share of the gains from the sale of this land as long-term capital gains.

The Internal Revenue Service determined that the income did not qualify as capital gains and assessed a deficiency against each of the plaintiffs for the years 1956, 1957 and 1958.

Pursuant to the determination of the Internal Revenue Service, plaintiffs, Charles C. and Emma Lee Clark, paid deficiencies in tax for the years 1956, 1957 and 1958 in the respective amounts of $928.99, $427.19 and $781.34.

Plaintiffs, McNutt and Troy Clark, paid deficiencies in tax for the same years in the respective amounts of $1,023.64, $335.24 and $813.62.

The payments were made by the parties on September 17, 1959.

Charles C. and McNutt Clark were appointed co-executors of their mother's estate prior to the examination of her tax returns. Pursuant to the determination of the Internal Revenue Service, the estate paid deficiencies in tax for like years in the respective amounts of $1,031.24, $507.33 and $824.04. Payment of these deficiencies was made on September 8, 1959.

Plaintiffs filed claims for refunds for the years in question, which were disallowed.

During the years indicated, plaintiffs sold the following number of lots from the tracts of land referred to herein as "Clark No. 1" and "Clark No. 2" which are involved in the proceeding:

|  | Clark No. 1 | Clark No. 2 |
|---|---|---|
| 1955 | 65 | 0 |
| 1956 | 12 | 15 |
| 1957 | 0 | 10 |
| 1958 | 0 | 4 |
| Totals | 77 | 29 |

Prior to the sale of the foregoing lots, plaintiffs made improvements to the two tracts of land involved as follows:

| Nature of Improvement | Clark No. 1 | Clark No. 2 | Total |
|---|---|---|---|
| Surveying | $ 450.00 | $ 790.95 | $ 1,240.95 |
| Rock & Tile | 885.46 | 833.19 | 1,718.65 |
| Labor | 654.19 | 787.46 | 1,441.65 |
| Water | 6,150.58 | 8,899.58 | 15,050.16 |
| Water Taps | 2,240.75 | – | 2,240.75 |
| Roads | 2,000.00 | 2,812.30 | 4,812.30 |
| Misc. | 261.25 | 662.33 | 923.58 |
| Supplies | – | 543.31 | 543.31 |
| Shrubbery | – | 39.00 | 39.00 |
| Equipment | – | 334.75 | 334.75 |
| Street Signs | – | 242.36 | 242.36 |
| Grading | 6,630.62 | – | 6,630.62 |
|  | $19,272.85 | $15,945.23 | $35,218.08 |

| | |
|---|---|
| Reimbursement of water line cost from Tapoco, Inc. | 18,135.72 |
| | $17,082.36 |

During the years in question, plaintiffs paid selling expenses in connection with the sale of lots as follows:

| Nature of Expense | 1956 | 1957 | 1958 |
|---|---|---|---|
| Selling Expense: | | | |
| Stamps & Deeds | $ 45.21 | $ 144.13 | |
| Legal | 386.00 | 254.05 | |
| Commissions | 1,367.09 | – | |
| Misc. | 47.91 | – | |
| Advertising | 150.50 | – | |
| Maintenance | – | 846.56 | |
| Telephone | – | 10.33 | |
| | $1,996.71 | $1,255.07 | None |

The gains realized by plaintiffs from the sale of lots during the years in question were as follows:

| 1956 | $20,294.58 |
|---|---|
| 1957 | 8,859.60 |
| 1958 | 16,730.10 |

The land involved was acquired by plaintiffs' predecessors in title from the State of Tennessee and by squatter's rights in the early 1800's and was held in the Clark family for residential and farming purposes during this long period of time.

The father died on April 11, 1954. The farm was being used for dairy purposes until 1946. At that time, the herd became unhealthy due to fluoride fumes that allegedly came from the Aluminum Company operation in Alcoa. Settlement was made for the alleged damages with the Aluminum Company for $10,-000.00 in 1947, at which time the Aluminum Company leased the farm for a period of three years. After the lease expired, beef cattle was purchased and the beef cattle operation existed for about two years. This operation was not profitable. Plaintiffs claim that it was not profitable because of injurious effects to the herd from fluorides. Whether this position is sound or unsound is not material to the determinative issues in the lawsuit. The property is located about two and a half miles from the Aluminum Company operation.

Thereafter, the mother and two sons decided to sell the property because it was not profitable for farming purposes. They first considered selling it as a whole. A man by the name of Huff offered $50,000.00 for approximately forty acres of the property that is involved. Attempts were not made to sell the farm in its entirety. A real estate operator by the name of Monday offered to purchase all the property but to pay for it over a period of twenty years. Offers received were not satisfactory.

They therefore decided to subdivide the property making two subdivisions out of it because the Hunt Road divided the farm.

The mother, Lina B. Clark, was a housewife and McNutt Clark was a farmer. Charles C. Clark was Sales Manager for McNutt Motor Company. He has been with this company since 1945. He lived with his mother, who was about 75 years of age at the time of his father's death, until her death.

They did not engage a real estate broker or employ a sales agent because of the expense. Charles C. Clark supervised the improvements on the property. The total advertising was one ad in the Maryville Times and one sign on Clark No. 1 and two signs on Clark No. 2. He had

no office, but transacted his duties in relation to the real estate while on the job at McNutt Motor Company or at his home. He wasn't listed as a real estate agent and did not have a real estate license.

Solicitation of sales was not made other than through advertisement. Prospective purchasers would come to him and when he made a sale he would call his lawyer, Kiser, who prepared the necessary sales papers.

The partnership, consisting of his mother, brother and himself, did not construct any buildings on the property, but a man by the name of Elrod, doing business as Guerin Company, constructed three, three-bedroom residences on Clark No. 1. The agreement with Elrod was to the effect that if any profits were made from the sale of the homes, Elrod was to get one-half and McNutt and Charles were to get one-fourth each. Charles C. Clark advanced $300.00 to Elrod for building expenses. Gillespie, a real estate man, advised him that if houses were constructed in the subdivision, it would make lots move on the market. The three houses were sold by Elrod and the profits derived therefrom divided one-half to Elrod and one-fourth each to the Clark brothers.

Plaintiff, Charles C. Clark, has never engaged in the real estate business although he owned four or five houses for rental purposes, and two, two-room houses for a short time which were acquired for a purpose not pertinent to the issues in this suit.

He still lives in the original farm house which his father owned at the time of his death.

He thinks that they made the decision to subdivide and sell lots in the year 1955. A subdivision plat of the lots was filed in the Blount County Courthouse.

He was on the scene part of the time when the improvements were being made and drove a tractor at times.

A school teacher friend stayed on the property while he was away, but did not make any sales.

FHA was contacted for commitment for loans but the representatives of that institution did not commit themselves.

He handled the sale of all the lots except the three houses constructed by Paul Elrod, but he set the prices thereon.

He bought additional property in 1945 and conveyed it to his mother and brother in 1955 so as to put it in the pool of the partnership property. This five acres went into subdivision No. 2.

The Texaco Service Station was built in 1957, but it is not a part of either Clark No. 1 or Clark No. 2. A lot was sold to Hugh Calloway in 1958 on which was constructed what is now known as the Phillips 66 Service Station.

McNutt Clark did not participate in any of the sales of the lots. He has never bought or sold any real estate. He owns and operates a farm in Blount County.

Schedule C of Charles C. Clark's income tax report for the year 1956, Exhibit 3, designates his principal business activities as "Partner-Motel and Service Station and Commissions". This schedule shows on line 1 that Charles C. Clark received $1,367.09 as commissions. The proof shows that this money was not paid to Charles Clark as commissions on the sale of lots, but was paid to him for services performed in connection with the property.

The gross income from the sale of the lots in 1955 was $82,758.00; 1956 $35,955.00; 1957 $15,758.02; and 1958 $21,150.00.

Charles C. Clark told the Internal Revenue agent while the latter was making his investigation that he was fascinated by subdivisions and that he expected to acquire another tract for subdivision.

The plaintiffs insist that they are entitled to treat the income from the sale of the lots which they jointly owned and which they sold during the material peri-

od as long-term capital gains as provided in Section 1221(1) and (2) [1] and 1231(a) and (b) [2] of the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 1221(1, 2), 1231(a, b).

■ The Government concedes that the plaintiffs are entitled to the treatment claimed unless the property was held by plaintiffs primarily for sale to customers in the ordinary course of their trade or business. If the property was held primarily for sale to customers in the ordinary course of trade or business, plaintiffs are not entitled to the favorable treatment provided in the foregoing sections of the Internal Revenue Code of 1954.

Taxpayers holding real estate have a right to dispose of it under conditions which will realize for them the greatest financial benefit. They are not required to sell it at once or as a whole in order to receive capital gains treatment, but may sell it off in parcels and over a period of time and may expend money in improving it in order to enhance its value and make it more attractive to pur-

chasers. The sale in parcels after it is improved does not convert it into a capital asset. Only when it is held primarily for sale in the ordinary course of taxpayer's trade or business does it lose its character as a capital asset.

Plaintiffs are not dealers in real estate. The sale of property in lots was a method chosen by them to liquidate the property which they had acquired by inheritance and which was no longer profitable as farm land. The improvements made were necessary to move the property as individual building lots and the advertising and sales activity was the minimum required to sell the lots.

■ The finding of the Commissioner that the property was held primarily for sale to customers is prima facie correct and shifts the burden of proof to the plaintiffs to establish that the property was held for investment and not for sale to customers in order to succeed. Greene v. Commissioner, 141 F.2d 645 (C.A. 5) certiorari denied 323 U.S. 717, 65 S.Ct. 45, 89 L.Ed. 577; Williams v. Commissioner, 45 F.2d 61 (C.A. 5).

1. "For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

"(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business."

2. "(a) General rule.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the

trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months * * *

"(b) Definition of property used in the trade or business.—For purposes of this section—

"(1) General rule.—The term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

"(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

"(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *."

■ The presumption disappears when proof is introduced to overcome it. In discussing this point, our Court of Appeals said:

> "It is not necessary for a taxpayer, in order to recover an assessment, to prove to, or to convince a jury that the Commissioner acted, in making the assessment, in a manner unwarranted by the actual facts, and unjust to plaintiff. While there is a presumption that the action of the Commissioner is correct, that presumption disappears when evidence is introduced to overcome it. * * * The presumption merely calls upon the opposing party to produce proof to establish his case. It is not evidence and may not be given weight as evidence." Kentucky Trust Co. v. Glenn, (C.A. 6) 217 F.2d 462, 465.

See: Godwin v. Brown, (C.A. 8) 249 F. 2d 356; Bush's Inc. v. United States, (C.A. 7) 277 F.2d 780.

If real estate is held as an asset within the meaning of the statute, the fact that the taxpayer improves and subdivides it so as to sell by lots rather than a whole does not deprive him of capital gains treatment granted to taxpayers on property from sales.

■ The courts have not devised any particular formula for determining whether or not property sold by a taxpayer was held by him for sale to customers in the ordinary course of his trade or business within the meaning of the statute. Each case has turned upon its own facts and circumstances. The intent of the taxpayer is an important, if not a controlling, factor in determining the question.

Numerous factors have been considered by the Court in an effort to determine the intent of the taxpayers, but no one factor, or combination of factors, is conclusive.

Some of the factors are: (1) the purpose for which the property was acquired; (2) the making of improvements on the property; (3) the advertising of it to attract purchasers; and (4) the continuity and frequency of sales as distinguished from isolated transactions. Di Lisio v. Vidal, (C.A. 10) 233 F.2d 909; Camp v. Murray, (C.A. 4) 226 F.2d 931.

The factors relied upon by the Government to support its insistence that the property was held primarily for sale to customers in the ordinary course of business are:

1. *Continuity of sales*—Sixty-five lots were sold in 52 transactions in 1955 and 12 lots were sold in 10 transactions in 1956 from Clark No. 1. Fifteen lots were sold in 11 transactions in 1956 and 10 lots were sold in 8 transactions in 1957 from Clark No. 2.

2. *The extent and substantiality of the sales*—Gross sales amounted to $82,758.00 in 1955; $35,955.00 in 1956; $15,758.02 in 1957; and $21,150.00 in 1958.

3. *The relation of the income from realty sales to the total income of the taxpayers*—The percentage of income from lot sales to the total income of McNutt Clark was 87.82% in 1955; 77.89% in 1956; 75.97% in 1957; and 79.41% in 1958. McNutt's income other than the income from sales of lots was derived solely from farming.

Lina B. Clark's percentage of income from the sale of lots to her total income was 92.59% in 1955; 63.54% in 1956; 42.15% in 1957 and 71.66% in 1958. Her occupation was that of a housewife and her only income other than that from the sale of lots was from rents and interest. Her income from rents and interest was comparatively small.

Percentage of lot sales to total income of Charles C. Clark was 76.83% in 1955; 55.14% in 1956; 33.59% in 1957; and 36.92% in 1958.

It is to be observed that the income of Charles C. Clark was much higher than that of his brother and mother due to the fact that he earned more from his work, received more interest and also received substantial sums from rental property.

4. *The general business activities of the taxpayers or those acting in their behalf in selling the property*—Charles C. Clark supervised the sales, but his mother and brother knew about the activities. He spent considerable time in looking after the property, especially during the year 1956.

5. *The nature and extent of improvements or other efforts to attract customers*—The improvements amounted to $35,218.08 less $18,135.72, reimbursement for water line from Tapoco, Inc., leaving a net sum paid by the taxpayers for the improvements of $17,082.36.

6. *The promotional activities of the taxpayers or those acting in their behalf*—The promotional activities consisted of a full page ad in the Maryville Times and three signs placed on the premises, two of which were small, also the construction of three small houses by Elrod to attract purchasers.

7. *The purposes for which the property was held at the time of the sales*—The Government insists that the taxpayers have not carried the burden of showing that the property was held for investment.

The test as to the application of the capital gains provisions of the statute is whether the purpose of the sales of the taxpayers was to liquidate the investment or to carry on the real estate business of selling lots. Goldberg v. Commissioner, (C.A. 5) 223 F.2d 709. Taxpayers insist that their purpose was to liquidate the property rather than to conduct a real estate business.

Taxpayers, in support of their insistence, cite the recent case of Barrios' Estate v. Commissioner, (C.A. 5) 265 F. 2d 517. In that case, the taxpayer acquired the land and farmed it until it became unsuitable for farming and then proceeded to subdivide it and sell lots for residential purposes without advertising or using a real estate agent. Eighty-eight sales were made during a three-year period of time. Such sales were made from the home of the taxpayer.

The Court reversed the Tax Court and held that the real estate was not held primarily for sale to customers in the ordinary course of the taxpayer's trade or business. This pertinent language was used by the Court:

"The idea of selling a large tract of land in lots embraces necessarily the construction of streets for access to them, the provision of drainage and the furnishing of access to such a necessity as water. It is hardly conceivable that taxpayer could have sold a lot without doing these things. To contend that reasonable expenditures and efforts, in such necessary undertakings are not entitled to capital gains treatment is to reject entirely the established principle that a person holding lands under such circumstances may subdivide it for advantageous sale." p. 520.

Taxpayers say that the percentage of income from the lots compared with other income of taxpayers is not controlling but such sales must be reviewed in the light of all the circumstances; that none of the taxpayers were in the high income bracket; that the improvements were at a minimum, and that the selling expense and advertising expense were nominal. Taxpayers say that in many of the cases relied upon by the Government, the taxpayer was engaged in real estate business before and after the sales, but in this case, the taxpayers were not engaged in the real estate business at any time.

The case of Cole v. Usry, (C.A. 5) 294 F.2d 426, is the most recent case that has come to the attention of this Court which deals with capital gains treatment granted taxpayers on profits from sales of lots from a subdivision.

The pertinent facts in that case were substantially as follows: In 1927, Mrs. Cole purchased 553.9 acres of land from R. R. Barrow, Inc., a family corporation. The land had been in Mrs. Cole's family since 1826 and contained the family residence. In 1935, 150 acres were sold for an airport and in 1943 another 200 or

300 acres were condemned by the United States for a naval air station. During 1951 and 1952, Mrs. Cole employed engineers and contractors to lay out three adjoining subdivisions on about 50 acres of the remaining 100 to 200 acres of the original tract. One subdivision was staked off in 42 lots in 1951. All the lots faced on the highway and roads were not required. In 1952, two other subdivisions were established of 57 and 14 lots, respectively. A general contractor cleared the property and cut and graded four streets with drainage ditches. The streets were then shelled as required by local ordinance. No facilities for water, sewage, gas, or electricity were installed in any of the three subdivisions. The overall expenditures in making the subdivisions came to $8,458.19.

Between 1951 and 1956, 93 lots were sold in 61 transactions with profits averaging between 74% and 97% of the sales price. The only advertising undertaken was the erection of a "For Sale" sign along the highway with Mrs. Cole's telephone number on it. Mrs. Cole's attorney handled the details of the sales and any customers who did not go to him directly were referred to him by Mrs. Cole. The attorney's compensation was paid by the purchaser. The notes on installment sales were collected by the bank.

Mrs. Cole spent long weekends at the family residence to handle all necessary matters which included, besides the sale of the lots, the management of some 5 or 6 thousand acres leased out for pastures, etc. The rest of the week was spent at the Cole's rented residence in New Orleans. With respect to the subdivisions, Mrs. Cole handled all matters personally except for the final sale concluded by her attorney.

The court, after reciting some of the factors to be considered in determining whether the lots were held and sold primarily in the course of taxpayer's business, set aside a verdict of the jury that adjudged that the property was held primarily for sale to customers, said in pertinent part.

"* * * Considering the case in its entirety, it seems clear to us that the controlling facts are so extreme as to make it utterly unreasonable to hold that the property here involved was held by the taxpayers primarily for sale to their customers in the ordinary course of their trade or business. Unless every jury verdict in cases of this kind is to be upheld, this one should be set aside and judgment for the plaintiffs should be entered notwithstanding the verdict. It is accordingly so ordered."

A case in our own Circuit, which deals with the subject under consideration, is that of Yunker v. Commissioner, 256 F. 2d 130. That case involved a widow who inherited 75 acres of undeveloped farm land in several parcels from her grandfather and her uncle in 1928 and 1935, respectively. In 1950, she decided to liquidate the parcels. She concluded that it was not feasible to sell them as a whole and thus subdivided it, made improvements consisting of roads, power lines, and surveys necessary to divide them into individual plots which were made attractive for sale. The Tax Court held that she was not entitled to capital gains treatment since she was holding the property for sale to customers. The Court of Appeals for the Sixth Circuit reversed and in doing so reviewed various cases and principles of law which are determinative of the issues involved in this case.

The case of Gudgel v. Commissioner, 273 F.2d 206, is another case from our Sixth Circuit. In that case, a farmer acquired land during the period from 1940 to 1945 and used it for farming purposes. Several years later, on account of the industrialization of the area, the land became unfit for farming purposes and beginning in 1948 the taxpayer subdivided the property and made improvements and began selling it in individual lots. To facilitate the sale and make the

land more desirable, he purchased a site for a shopping center near the farm. In the years 1951, 1952 and 1953, the taxpayer sold a large number of lots which had been subdivided and improved. The Court of Appeals reversed the decision of the Tax Court and again reviewed the decisions of other courts on the issue that is involved in the case under consideration.

■ We think the principles announced by our own Circuit in the Yunker and Gudgel cases are decisive of our case. See also Smith v. Dunn, (C.A. 5) 224 F.2d 353; Camp v. Murray, supra.

In the case of Bauschard v. Commissioner, 279 F.2d 115 (C.A. 6) the taxpayer was denied capital gains treatment. The taxpayer was a Catholic priest. He and another person purchased the real estate involved. Title was taken in the name of a trust. The trustee made a contract with a real estate developer granting him a five year lease with an option to purchase any and all lots at a price to be agreed upon by the parties. The realtor had the authority to enter contracts as vendor and formed a corporation to develop, subdivide and sell the lots. The trustee signed the deeds and after an accounting, the net proceeds were distributed to the taxpayer and the other owner. The Court found as a fact, that the interest of the taxpayer in the development and the control he exercised over the selling price, were sufficient to place him in the real estate business.

The facts in that case are different from the facts in the present case in that the property in that case was purchased and held primarily for sale in the regular course of the taxpayer's real estate business.

It must be kept in mind that the taxpayers here inherited the property which they subdivided and from which they received their income. They decided to liquidate the property. The mother was an elderly lady who had no occupation. One of the brothers was a farmer and the other one an automobile salesman. They had one offer to sell all of the property as a whole, but this was not considered a sound offer because the offeror wanted to pay over a period of twenty years. They had another offer to sell substantial acreage at a price of $50,000.00 but did not consider the price sufficient. They believed that they could realize more from the property by selling in lots and this is what prompted them to create the subdivision and to make the improvements consisting of grading, surveying, building roads, and installing water systems.

They did not solicit sales. Charles C. Clark negotiated with those parties who approached him and who were interested in the purchase of lots.

During the years 1955 through 1958, inclusive, 109 lots were sold. Capital gains treatment has been granted taxpayers in cases where the frequency and extent of sales were greater than in the present case. See Goldberg v. Commissioner, supra; Ross v. Commissioner, (C.A. 5) 227 F.2d 265; Consolidated Naval Stores v. Fahs, (C.A. 5) 227 F.2d 923.

In the present case, the largest number of sales were made in 1955, namely, 65 lots and thereafter the sales were comparatively few, being 29 lots in 1956, 10 in 1957 and 4 in 1958.

We believe and find that the facts and circumstances in this case show that taxpayers did not hold the property primarily for sale to customers in the ordinary course of their trade or business. It is the view of this Court that the sales of the property were made for the purpose of liquidation and that the taxpayers are entitled to capital gains treatment.

Present order.